[No. S001886. Mar. 3, 1988.]

CHARLES WALLACE COPPOCK, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Charles Wallace Coppock, in pro. per., and Harry Allen for Petitioner.

Herbert M. Rosenthal, Truitt A. Richey, Jr., Magdalene Y. O'Rourke and Jerome Fishkin for Respondent.

OPINION

THE COURT—We review the recommendation of the Review Department of the State Bar Court that petitioner be ordered suspended from the practice of law for two years, that execution of suspension be stayed, and that petitioner be placed on two years' probation on specified conditions including ninety days actual suspension and payment of restitution. The review department found that petitioner allowed a client to use his client trust account in a scheme to defraud the client's creditors. We adopt the review department's recommendation as to discipline.

## I. FACTS

Petitioner was admitted to practice law in April 1978. He has no prior record of State Bar discipline.

The unusual facts that resulted in this disciplinary action involve the misuse by petitioner's client, Robert Pollock, of a client trust account set up by petitioner for Pollock's funds. Petitioner first met Pollock in 1979, when he agreed to defend his wife, Sandra Pollock, in a fraud action. An apparently related fraud action against Robert Pollock himself had been concluded in 1972, resulting in a $64 million judgment against him. Petitioner was aware of the outstanding fraud judgment against Pollock, but insists he believed Pollock was innocent of fraud in the prior matter. In Sandra's case, petitioner states, "I ineptly attempted to champion Sandra Pollock's defense . . . only to ultimately cause a default to be entered in excess of 55 million dollars." Petitioner brought a motion on behalf of Sandra Pollock to set aside the default. The trial court denied the motion. Petitioner then attempted to appeal that ruling, but the appeal was ultimately dismissed, apparently because petitioner failed to file a timely notice of appeal.

Meanwhile petitioner "had become very close to Pollock," and he asserts that for this reason the Pollocks, although "of course dismayed to learn that I had mishandled their appeal," chose not to take action against him for his admittedly "clear mishandling of their matter." Instead, Pollock sought petitioner's assistance in setting up a trust account to conceal money from the Pollocks' judgment creditors and enable Pollock to manage his business affairs unhampered by attempts to attach his funds. Petitioner states he agreed to set up the account because he was "beleaguered by a sense of guilt" about Sandra Pollock's default judgment, and was trying "to redress [this] wrong."

In July 1981, petitioner opened a bank account designated "Wally Coppock, Attorney at Law, Clients Trust Account." He states he established the account so that "Pollock could be shielded from any attempts to execute on that account," and notes he intended the account to contain only Pollock's funds. He gave total control of the account to Pollock, and for a period of approximately two years supplied him with signed checks and deposit slips to facilitate his use of the account. Petitioner initially reviewed the monthly trust account statements, but admits that by the second year he became "lax," and "paid less attention" to supervising the account. Pollock, acting without interference or supervision from petitioner, eventually used the trust account to commit fraud against third parties.

About one year after the account was opened, Pollock became involved in an investment venture with James and Marie DeMers to organize an offshore bank. In connection with this venture, Pollock retained an attorney in Panama, Charles Novo-Gradac. In May 1983, at Pollock's request, the DeMerses sent Pollock a check for $10,000, to purchase a bond for capitalization of the offshore bank. They made the check out to the "Novo-Gradac

Trust Account for First Liberty Bank & Trust." In June 1983, Pollock deposited the DeMerses' check (which had been indorsed, "For Novo Gradac trust account . . . Deposit to Wally Coppock, Attorney at Law Clients Trust Account/ For Deposit Only," and bore the signature "Wally Coppock") in petitioner's trust account. Thereafter the account balance declined to $508.42. In August 1983, after Pollock made another deposit raising the account balance to $7,998.42, petitioner closed the account and gave Pollock the entire balance.

In October 1983, Pollock informed the DeMerses he could not purchase the bond with their $10,000. He failed to return any of the money. In March 1984, after repeated requests to both Pollock and petitioner for the return of their money, the DeMerses reported the matter to the police. Several months later they applied to the State Bar Client Security Fund for reimbursement. The State Bar then brought this disciplinary action against petitioner.

The State Bar's notice to show cause alleged petitioner "gave control of [his] trust account to [Pollock], although [he] knew that there was a fraud judgment against [Pollock] in excess of $50,000,000[,] . . . bel[ie]ved that he intended to use [petitioner's] trust account for personal transactions and to conceal his funds from creditors," and "failed to supervise his administration of [the] trust account." In his answer, petitioner admitted these allegations. His answer also admitted most of the other allegations of the notice, apparently including that he had willfully violated his oath and duties as an attorney, "[c]ommitted acts involving moral turpitude, dishonesty, and corruption; and/or . . . [v]iolated fiduciary duties [he] owed to the DeMers[es]."

In his answer, petitioner denied only that he had indorsed and deposited the DeMerses' $10,000 check himself, and stated he had "no personal knowledge to admit or deny" the allegation that "[n]o part of the DeMers[es]' $10,000 has been used for the entrusted purposes, or for any other purpose on account of the DeMers[es] or either of them." By a later stipulation, petitioner agreed that this allegation could be proved by declaration, and waived the personal appearance of the DeMerses.

## II. FINDINGS AND RECOMMENDATIONS OF THE STATE BAR COURT

The hearing panel concluded that petitioner violated his duties as an attorney as set out in Business and Professions Code section 6068.[1] It found he had "relinquished supervision" of his trust account to Pollock and

---

[1] All further statutory references are to this code unless otherwise indicated.

"failed to control, supervise, maintain, investigate or review statements of deposits or withdrawals" of the account. It also found, however, that petitioner received no benefit from Pollock's use of the account, did not misappropriate or commingle funds, and did not put any trust account funds to personal use. The panel determined petitioner had never represented the DeMerses in any capacity, that he had no fiduciary relationship with them, and no knowledge, before he closed the trust account, of any dealings between Pollock and the DeMerses. It found the DeMerses entrusted their $10,000 to Pollock alone. In addition, the panel found that petitioner never authorized Pollock to indorse or sign any document on his behalf, and that petitioner's signature on the DeMerses' $10,000 check was forged. It concluded that petitioner had committed "no dishonest act," and no act involving moral turpitude.

The panel further found petitioner's judgment in this matter had been affected by his "manic-depressive state" following his unsuccessful representation of Sandra Pollock, and also by his failure at that time to maintain the proper dosage of lithium for treatment of his manic-depressive episodes. It listed as "mitigating" factors: (a) no prior record of discipline or client complaints; (b) good faith; (c) lack of harm to petitioner's client; (d) cooperation with the State Bar; (e) remorse; (f) emotional difficulties; and (g) good character. It also noted that petitioner had engaged in pro bono work, and that he was "uncertain over his obligations of restitution" in this case. It recommended one year suspension, stayed, with one year probation on condition of ninety days actual suspension, and no restitution.

The review department adopted the findings of the hearing panel, with several amendments. Most importantly, it amended finding of fact number 5 (that petitioner's "trust account was opened for the exclusive use of Robert Pollock, a client [he] represented") by adding that the account "*was opened for the purpose of defrauding Mr. Pollock's creditors.*" (Italics added.) The department deleted the panel's conclusions that petitioner had no contact or relationship with the DeMerses, and that he had committed no dishonest act.[2] In addition to increasing the recommended suspension to two years, execution stayed, with a two-year probation conditioned on a ninety-day actual suspension, the review department recommended petitioner be required to make restitution to the DeMerses in the amount of $10,000 plus interest, and that he obtain psychiatric or psychological treatment. The department stated its reason for the increased discipline was that

---

[2] The review department deleted the panel's findings and conclusions relating to petitioner's lack of relationship with the DeMerses because these issues were considered separately in the client security fund proceedings, which were severed from the disciplinary proceedings after the hearing panel rendered its findings. We are informed the client security fund application is still pending.

"allowing a client to use the attorney's trust account in a scheme to defraud the client's creditors is a very serious offense warranting greater discipline than recommended by the hearing panel." Three of the fourteen referees voted against the recommendation, "because the recommended degree of discipline is *insufficient* based on the above-mentioned scheme to defraud." (Italics added.)

## III. DISCUSSION

Petitioner concedes that his conduct was "culpable," and that he is subject to discipline for his "misjudgment." Nonetheless, he argues that the discipline recommended by the review department is too severe, and asks that we delete the requirements of actual suspension and restitution. He challenges the recommendation on three grounds.

First, he claims he was denied a fair hearing because the review department did not allow him to withdraw his factual stipulations after discovering that the examiner had withheld information from him. Second, he asserts the review department's findings as to his fraudulent purpose are not supported by the evidence. Finally, he argues the recommended discipline is excessive in light of the mitigating factors.

### A. *Request to Withdraw Stipulations*

■ Before the review department, petitioner requested that he be allowed to withdraw the "factual stipulations" he had made, on the ground the bar examiner had withheld information from him. The review department did not address this issue, and petitioner now argues that its failure to grant his request denied him a fair hearing. This contention lacks merit.

Petitioner fails to specify what stipulations he wished to withdraw. The only material stipulation in the record is the "First Stipulation Re: Proof of Facts," and we assume he refers to this.[3] In this stipulation petitioner waived the personal appearance of the DeMerses and agreed that the allegation that no part of their $10,000 had been used for the intended purposes could be proved by declaration. Pursuant to the stipulation, the examiner submitted in evidence James DeMers's declaration, which stated that the DeMerses had sent the $10,000 check to Pollock "for the express purposes of purchasing a bond to begin capitalization of the off-shore bank," and that the "$10,000 was never used to purchase a bond, nor was it ever used in

---

[3] Petitioner seems to imply that he should have been allowed to withdraw the admissions made in his *answer* as well. There is no indication that his answer was arrived at through a stipulation, and we see no reason to allow him to withdraw his answer.

conjunction with an off-shore bank, nor was it ever used for any other purposes of ours whatever."

Withdrawal of factual stipulations is generally not permitted. In disciplinary matters, we have held, "Ordinarily . . . the stipulated *facts* may not be contradicted; otherwise the stipulation procedure would serve little or no purpose, requiring a remand for further evidentiary hearings whenever the attorney deems it advisable to challenge the factual recitals." (*Inniss* v. *State Bar* (1978) 20 Cal.3d 552, 555 [143 Cal.Rptr. 408, 573 P.2d 852].)

In this case, however, petitioner argues that because he was not aware of certain evidence which he claims the examiner withheld from him at the time he made the stipulation, he was denied a fair hearing. He complains that the examiner withheld the DeMerses' application for client security fund reimbursement and did not introduce it into evidence until late in the hearing, and that therefore petitioner "was not afforded a reasonable opportunity to utilize the newly discovered information contained therein." The new information to which petitioner refers is a statement in the application that Novo-Gradac "had endorsed [the $10,000 check] over to [petitioner]."

Petitioner's argument fails for several reasons. First, it is not clear that the examiner did in fact "withhold" evidence from petitioner. Petitioner had been aware of the DeMerses' application since at least April 1986, when he received notice of an order consolidating the disciplinary and client security fund matters, and there is no indication in the record that petitioner sought discovery of the application or any other documents or records. Petitioner states he did ask to see the application, and the examiner "refused me access to the application." We see no evidence in the record, other than petitioner's own unsupported statement in his brief, either that he requested to see the document or that the examiner improperly refused him access to it.

Second, at the hearing petitioner expressly stated that he did not object to the admission of the application. He simply pointed out to the panel a paragraph of the application stating that he had "never admitted obligation" to the DeMerses. Further, he failed to state at the hearing that he had not previously seen the application, and did not request a continuance to review it. In *Walter* v. *State Bar* (1970) 2 Cal.3d 880, 890 [87 Cal.Rptr. 833, 471 P.2d 481], we held that an attorney who claimed he had no opportunity to examine documentary exhibits before the panel hearing failed to show a due process violation because "[t]he record discloses that petitioner did not request a continuance of the proceedings in order to examine the exhibits, nor did he raise before the disciplinary board the point that he had not been allowed to examine them."

Third, it is unclear how the information that Novo-Gradac indorsed the check is relevant to the stipulation. Before the review department, petitioner maintained that he "entered into the factual stipulations believing that Pollock had forged the entirety of the endorsement on the back of the subject check." He argued that the fact that Novo-Gradac indorsed the check showed that Novo-Gradac had committed "malpractice and fiduciary irresponsibility" by giving the check to Pollock, and that therefore Pollock's forgery was not the sole cause of the injury to the DeMerses. Petitioner asserted that it was not foreseeable that Pollock would have obtained a check made out to another attorney's trust account, and that he entered into the stipulation without realizing the true facts of the case. We find the "newly discovered information" regarding the indorsement does not appear to alter the culpability of either petitioner or Pollock with respect to the DeMerses. Petitioner still admittedly opened the trust account for Pollock's use, and then failed to supervise the account, thereby allowing Pollock to deposit the DeMerses' check in that account and to use their money for purposes not authorized by the DeMerses, resulting in fraud against them.

■ Petitioner also argues that the examiner engaged in "prejudicial misconduct" by suppressing a letter from Marie DeMers addressed to petitioner in care of the examiner, in which she requested restitution from petitioner. The record reveals that, at worst, the examiner inadvertently neglected to forward the letter to petitioner. Although we disapprove of suppression of information by the State Bar, in this case it does not appear that petitioner was prejudiced if indeed the letter was improperly withheld from him. The DeMerses contacted petitioner directly numerous times in an attempt to recover their money, and although petitioner stated he was willing to make restitution, he paid them nothing. Further, petitioner informed the panel at the hearing that he had received the letter from the examiner only a week before, and the panel made a finding that he was unsure of his restitution obligations.

■ Finally, petitioner implies that because of the "quasi-criminal" nature of disciplinary proceedings, he is entitled to heightened procedural protections. The rules of criminal procedure, however, do not apply in State Bar disciplinary proceedings, and petitioner's "only due process entitlement is a 'fair hearing.'" (*Rosenthal (J.B.)* v. *State Bar* (1987) 43 Cal.3d 612, 634 [238 Cal.Rptr. 377, 738 P.2d 723].) We conclude petitioner's right to a fair hearing was not violated here.

B. *Sufficiency of the Evidence*

■ Petitioner claims the review department's findings are not supported by sufficient evidence. He objects particularly to its findings that his trust

account was opened for the purpose of defrauding Pollock's creditors, and that he allowed Pollock to use it in a "scheme to defraud" his creditors.

The State Bar's factual findings, whether made by the hearing panel or the review department, are not binding on this court. (*Franklin* v. *State Bar* (1986) 41 Cal.3d 700, 708 [224 Cal.Rptr. 738, 715 P.2d 699].) " 'This court must independently examine the record, reweigh the evidence, and pass on its sufficiency in State Bar disciplinary matters.' [Citations.]" (*Ibid.*) We resolve all reasonable doubts in favor of the attorney. (*Galardi* v. *State Bar* (1987) 43 Cal.3d 683, 689 [238 Cal.Rptr. 774, 739 P.2d 134].) Generally, however, the findings of the State Bar Court are entitled to great weight, and are presumed to be supported by the record; petitioner bears the burden of demonstrating " 'that the charges of unprofessional conduct are not sustained by convincing proof and to a reasonable certainty. . . .' [Citations.]" (*Ibid.*)

In this case, the hearing panel and the review department differed in some of their factual and legal conclusions. The panel found the petitioner had engaged in "no dishonest act." The review department deleted this finding, and in contrast found that petitioner had opened the client trust account for Pollock for the purpose of defrauding Pollock's creditors, and allowed him to use the account in furtherance of that fraud. In light of this disagreement, we must carefully review the record to make our own factual determinations. (See *Franklin, supra*, 41 Cal.3d at p. 706.)

Petitioner argues that we should give greater weight to the hearing panel's findings than the review department's because the panel had the opportunity to see him testify and observe his demeanor. Certainly when the hearing panel findings " ' "rest primarily on testimonial evidence, we are reluctant to reverse the decision of the [hearing panel], which was in a better position to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony." ' [Citations.]" (*Alberton* v. *State Bar* (1984) 37 Cal. 3d 1, 12 [206 Cal.Rptr. 373, 686 P.2d 1177].) In this case, however, the findings do not rest on a resolution of conflicting testimony. Petitioner was the only witness to testify at the two-hour long hearing. And although petitioner's demeanor may be relevant to an evaluation of his honesty, the record shows that petitioner also appeared before the review department, and answered questions there, thus giving the department as well as the panel an opportunity to observe his demeanor and evaluate his credibility. In addition, the State Bar's case rests largely on documentary evidence, including petitioner's own written

admissions. Therefore, we do not find it appropriate to rely on the panel's findings more heavily than on those of the review department.[4]

■ Petitioner admits most of the allegations against him. He admits he opened the trust account with the intent of concealing funds from Pollock's creditors. He also admits he failed to supervise the account, and by providing Pollock with signed checks and deposit slips allowed him to use it without hindrance for fraudulent purposes. Petitioner further acknowledges that when he closed the account he gave the balance, almost $8,000, to Pollock. The one substantial question on which the panel and review department disagree is the extent of petitioner's fraudulent purpose. Our finding on this matter depends on a careful evaluation of all the evidence before us.

Petitioner never claimed to be unaware of the purpose of the account when he opened it, but rather asserted that he thought the admitted purpose (hiding Pollock's funds from creditors) was not fraudulent. Although the trust account was intended to conceal Pollock's funds, petitioner insists he "thought the monies would be ultimately exempt from successful attachment," and therefore "did not believe he was fraudulent[ly] concealing money from Pollock's creditors." He explains that the purpose of the account was "to exclusively hold the Pollocks' income," and that he "naively believed that their meager income would be fully exempt from execution" by their creditors.

Petitioner's assertions of naivete and ignorance do not help him. First, even accepting as true petitioner's claim that in opening the account he had no "active" intent to defraud, it is clear that given his knowledge of Pollock's history, he should have been more circumspect when first opening the account, rather than accepting without corroboration Pollock's assurances that (a) his earnings would be exempt from execution, (b) only exempt funds would be placed in the account, and (c) no money belonging to third parties would be deposited in the account.

Second, we are not persuaded that petitioner indeed had no dishonest intent. He admits an intent to *conceal* funds from Pollock's creditors, to enable Pollock to avoid the inconvenience of having his funds tied up in

---

[4]We have previously adopted findings of the review department even though they were based on the resolution of conflicting testimony. (See, e.g., *Galardi, supra,* 43 Cal.3d at p. 692; *Lee* v. *State Bar* (1970) 2 Cal.3d 927, 938-940 [88 Cal.Rptr. 361, 472 P.2d 449].) In *Galardi,* the review department made findings regarding certain matters that were not discussed at all by the panel. Although we acknowledged that "the department merely reviewed the hearing transcripts and did not view the witnesses as they testified," we found the review department's findings, based on its review of the hearing transcripts, were justified. (43 Cal.3d at p. 692.)

court proceedings before they were determined to be exempt from attachment. This amounts to an admitted intent to deceive. ■ We have held that an act by an attorney for the purpose of concealment or other deception is dishonest and involves moral turpitude under section 6106. In *Crane v. State Bar* (1981) 30 Cal.3d 117 [177 Cal.Rptr. 670, 635 P.2d 163], an attorney representing sellers of real estate crossed out certain material in a statement by the beneficiary under the first trust deed on the property, then forwarded the statement to the escrow company without notifying that company that the deletions were made by him without the knowledge or consent of the trust beneficiary. The deleted material would have given notice that the beneficiary intended to enforce an acceleration clause in the note and deed of trust. The attorney argued that his unauthorized alteration of the statement, and the resultant deception of the escrow company, were not "dishonest" acts because his intent was merely to prevent the beneficiary from improperly interfering with the prospective sale by asserting demands which it had no right to make. Our response was to "reject petitioner's disavowal of any dishonest intent." (*Id.*, at p. 122.) We found the alteration was "deceptive and known by [the attorney] to be so." (*Ibid.*) We stated that regardless of the legal merits of the attorney's conclusion that the beneficiary could not lawfully assert the acceleration clause, "the means used by petitioner to further his position were dishonest and involved moral turpitude within the meaning of . . . section 6106 and warrant discipline." (*Ibid.*)

In the earlier case of *Hallinan* v. *State Bar* (1948) 33 Cal.2d 246 [200 P.2d 787], we approved a three-month actual suspension for an attorney who simulated the signature of his client on a settlement release. The attorney had broad power of attorney from the client, and the client had no complaint about the attorney signing his name and settling the case. However, because the lawyer signed the release with the intent that opposing counsel would believe the client himself had signed it, we found it "evident that petitioner practiced a deception upon [opposing counsel], that is, by leading [opposing counsel] to believe that [the client] had personally signed the settlement papers . . . . Although *he may have been legally authorized to simulate [the client's] signature* under his power of attorney, . . . yet he should not have led [opposing counsel] to believe that [the client] had personally signed, knowing that [opposing counsel] expected and thought he was getting [the client's] signature. Such conduct should not be condoned." (*Id.*, at p. 249, italics added.) In short, an attorney is not permitted to engage in deceptive acts even when he believes his action is legally justified. (See also *Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567, 577 [119 Cal.Rptr. 335, 531 P.2d 1119] [attorney's issuance of numerous checks returned for insufficient funds "manifests an abiding disregard of ' "the fundamental rule of ethics—that of common honesty—without which the

profession is worse than valueless in the place it holds in the administration of justice." ' (Citation.)"]; *Lee* v. *State Bar, supra*, 2 Cal.3d at p. 941.) ■■ Here, although petitioner may have believed that his concealment of funds was "not fraudulent," we find his admitted purpose was dishonest, and in itself would have been sufficient to subject him to discipline.

■■ ■■ Moreover, petitioner then compounded his misconduct by relinquishing all control of the trust account to Pollock. He admits he failed to supervise Pollock's use of the account, or even to review account statements. Because petitioner designated the account his "clients trust account," he was responsible for the funds in that account, and it was a breach of his professional duties to give complete control of the account to Pollock. In *Gassman* v. *State Bar* (1976) 18 Cal.3d 125, 129-130 [132 Cal.Rptr. 675, 553 P.2d 1147], we held actual suspension of one year to be justified where the attorney had failed to establish an accounting procedure for his client trust account, and where this "willful failure was *a result of his knowing delegation of responsibility* to [his secretary-bookkeeper] and his *failure to supervise* [the secretary-bookkeeper] adequately." (Italics added.) In this case, petitioner similarly breached his nondelegable duty to administer his trust account properly.

Assuming arguendo that petitioner was, as he maintains, unaware of Pollock's misuse of the account, his ignorance of the facts is no excuse, for it resulted from his own dereliction of duty. He was unable to prevent the fraud against the DeMerses precisely because he failed to supervise his account. Had petitioner retained control of the account, he would have seen that the DeMerses' check, indorsed over to his trust account, did not represent Pollock's earnings, but was money entrusted for the purchase of a bond. With proper supervision of the operation of the account, petitioner would have been able to monitor both the source and the use of account funds, and been able to guard against misuse of those funds. Finally, when he closed the account, his claimed ignorance led him to give the remaining balance to Pollock, although had he known the source of the trust account funds and what Pollock had done with the DeMerses' money, he might have been able to cause some money from the account to be returned to the DeMerses.[5] Thus at various junctures in the course of Pollock's scheme,

[5] In addition, the evidence indicates that petitioner was not entirely unaware of the possibility of Pollock's fraudulent use of the account, at least by the time he closed it. First, he admittedly knew Pollock would use the account to conceal funds. Then, he states he closed the account after becoming suspicious that Pollock was "misusing" it, because of a check that had been returned for insufficient funds. The bank statements show the account remained open for more than two months after a "Not Sufficient Funds" charge was assessed against it. The record also contains petitioner's statement that when he closed the account he was aware that Pollock had deposited "other people[']s funds" in it.

petitioner's failure to supervise his trust account facilitated and furthered the fraud.

Petitioner contends his conduct was at worst negligent. ■ As we have often pointed out, "[e]ven if petitioner's conduct were not wilful and dishonest, gross carelessness and negligence constitute a violation of an attorney's oath faithfully to discharge his duties and involve moral turpitude." (*Jackson* v. *State Bar* (1979) 23 Cal.3d 509, 513 [153 Cal.Rptr. 24, 591 P.2d 47].) ■ We find petitioner's conduct clearly amounted to "gross carelessness and negligence," given the pattern of neglect of his professional responsibilities in the face of circumstances that should have led him to be vigilant. In *Palomo* v. *State Bar* (1984) 36 Cal.3d 785, 796 [205 Cal.Rptr. 834, 685 P.2d 1185], the attorney gave control of his client trust account to his office manager, and then failed to examine her records or the bank statements. We stated that the attorney's failure to supervise the management of the account, or to check the records, "permitted the fact that a substantial client check endorsed by him had been misdeposited, commingled and misappropriated to escape his notice for four months. . . . Any procedure so lax as to produce that result was grossly negligent." (*Id.*, at p. 796, fn. 8.) Thus we held the attorney's conduct was sufficiently "wilful" to merit discipline. (*Id.*, at p. 796.) Similarly, petitioner's conduct merits discipline, even without a showing that he was fully aware of Pollock's fraud against the DeMerses.

Petitioner has admitted the essential facts of his wrongdoing. He argues, however, that his admissions and stipulations resulted from the examiner's concealment of information from him, so that "he had no information to counter the examiner's charges." He asserts that the examiner's failure to give him the DeMerses' reimbursement application (containing the reference to Novo-Gradac's indorsement of their check) caused him to make admissions that he otherwise might not have made: "This information was crucial to Petitioner since Petitioner had already formed the opinion that Pollock had betrayed him. Since the act of forgery is closely akin to fraud Petitioner fell prey to the examiner's charges that Pollock was indeed a 'fraud.'"

This line of reasoning is utterly unpersuasive. A subsequent lack of access to evidence cannot affect the knowledge and intent petitioner had when he opened the trust account and continued to allow Pollock to use it unsupervised. And, in fact, petitioner's factual assertions in his arguments before the review department and this court (*after* he gained access to the DeMerses' application) are no different from those he made before the panel.

In sum, we find there is sufficient evidence on the record to sustain a finding that petitioner allowed Pollock to use his trust account in a scheme

to defraud. He opened a trust account for a dishonest purpose, and then systematically failed to examine the records and supervise the management of the account, thereby enabling Pollock to use it in his fraud against the DeMerses. Petitioner's protestations of his innocent intent and ignorance of Pollock's scheme do not render the evidence on the record less persuasive.

## C. *Appropriateness of Recommended Discipline*

Petitioner argues that the discipline recommended by the review department was "unwarranted in light of the findings of 7 factors in mitigation." Although we have the ultimate responsibility for determining the appropriate discipline, "we attach great weight to the review department's disciplinary recommendation. [Citation.] Petitioner bears the burden of proving that this recommendation is erroneous. [Citation]." (*Rosenthal (M.B.)* v. *State Bar* (1987) 43 Cal.3d 658, 661-662 [238 Cal.Rptr. 394 [738 P.2d 740].) In addition, "[a]s we have frequently noted, the department's proposal of discipline is entitled to greater weight than that of the panel. [Citations.]" (*Galardi, supra*, 43 Cal.3d at pp. 693-694.) As we shall explain, petitioner has failed to show the review department's recommendation to be erroneous.

### 1. *Letter From Petitioner's Psychiatrist*

Petitioner attached to his brief before this court a letter from his psychiatrist, in which the psychiatrist states, "[petitioner] has advised me that he would be willing to cooperate" with the State Bar during his probation, and declares that he is "confident that the public will be protected since, on his own, [petitioner] has been involved in therapy and has been stabilized on Lithium since October 1981." Petitioner submits the letter to support his contention that the recommended discipline is excessive. The letter was not presented in the proceedings below, however, and we therefore conclude it is not properly before us for this purpose.[6]

"This court has on occasion considered matters extrinsic to the record which are relevant to an attorney's fitness to practice law. [Citations.]

---

[6] The letter also states that during a period of "depression" beginning in May 1981 (before his opening of the trust account) petitioner's "mental condition was such that it would have been unlikely for him to have participated in a deliberate scheme to defraud other persons." Petitioner suggests we should consider this statement as evidence refuting the review department's factual findings regarding his participation in fraud. We decline to do so. In *Palomo, supra*, 36 Cal.3d 785, the attorney asserted for the first time before this court that he had suffered from severe "anxiety adjustment syndrome" at the time of his misconduct. He asked leave to submit a psychologist's report on this condition. We stated that although we independently review the State Bar Court's factual findings, "we do not consider evidence never presented in the disciplinary proceedings below. Nor, absent an error which prevented its introduction . . . , will we remand for consideration of the new evidence." (*Id.*, at p. 797.)

However, the strong preference is for such matters to be submitted to the hearing panel, which is better suited to determine what weight to give them. This preference is particularly strong where, as here, the extrinsic evidence consists of *opinions about petitioner's mental attitude,* and is based largely on petitioner's own out-of-court statements. Such evidence is virtually impossible to evaluate in the absence of cross-examination." (*In re Possino* (1984) 37 Cal.3d 163, 171 [207 Cal.Rptr. 543, 689 P.2d 115], fn. omitted, italics added; but see, e.g., *Doyle* v. *State Bar* (1976) 15 Cal.3d 973, 980, fn. 2 [126 Cal.Rptr. 801, 544 P.2d 937] [although not part of record in proceedings below, psychiatrist's declaration stating petitioner would benefit from planned psychotherapy "may be considered in determining petitioner's fitness to practice."].) We also noted in *Possino* that in any event the new evidence would not compel a lesser discipline than that recommended. (37 Cal.3d at p. 171.)

In *Rosenthal (M.B.), supra,* 43 Cal.3d 658, we discussed evidence similar to the letter submitted by petitioner, which also was not included in the record below, and was offered by the attorney to support his contention that the recommended discipline was too severe. There, the attorney asked us to consider psychiatric evaluations and letters which he said demonstrated his efforts at rehabilitation. We stated, "In general, this court does not consider evidence which was not presented to the State Bar during its review process." (*Id.,* at p. 663.) Following *Possino, supra,* 37 Cal.3d 163, we concluded, "Petitioner's documents are inherently unreliable . . . . The letters and reports merely reflect personal beliefs in petitioner's continued recovery, and are based exclusively upon conversations or interviews with him." (43 Cal.3d 658, 663.) In *Rosenthal,* as in *Possino,* we also noted that in any event the new evidence would not compel a lesser discipline. (*Ibid.*)

Thus, we generally do not consider evidence outside the record when determining the appropriate discipline, especially if the extrinsic evidence consists of statements of opinions about the petitioner's mental attitude. Following *Rosenthal (M.B.), supra,* 43 Cal.3d 658, and *Possino, supra,* 37 Cal.3d 163, we will not consider petitioner's letter here. Even if we were to consider it, however, it would not significantly affect our evaluation of the appropriate discipline.

### 2. *Terms of Recommended Discipline*

 Petitioner's conduct, although it did not harm his clients, nonetheless warrants discipline. (See 1 Witkin, Cal. Procedure (3d ed. 1985) Attorneys, § 408, pp. 459-460, and cases cited.) It is clearly established that participation in a scheme to defraud a client's creditors is a crime and subjects an attorney to discipline. (*Allen* v. *State Bar* (1977) 20 Cal.3d 172,

178 [141 Cal.Rptr. 808, 570 P.2d 1226]; Pen. Code, § 531.) In *Townsend* v. *State Bar* (1948) 32 Cal.2d 592 [197 P.2d 326], an attorney advised his client to make a conveyance of certain real property for the purpose of delaying and defrauding creditors. This conduct was found to violate sections 6103 and 6106 (*id.*, at pp. 595-596), and in light of the attorney's prior disciplinary record we ordered him actually suspended for three years. (*Id.*, at p. 598.) In *Yokozeki* v. *State Bar* (1974) 11 Cal.3d 436, 445, footnote 4 [113 Cal.Rptr. 602, 521 P.2d 858], we noted that the attorney "participated in a scheme to defraud [a client's] potential judgment creditors, which is a crime (Pen. Code, § 531), and a proper subject for disciplinary action."

■ Petitioner urges, however, that the terms of the recommended discipline in his case are not justified because he did not intend to defraud the DeMerses, nor did he foresee any harm to them. It may be true that petitioner did not specifically intend to defraud the DeMerses, but it does not follow that the recommended discipline is too severe. As we have often repeated, in imposing discipline, we do not simply impose retribution and punishment, but seek to protect the public, to preserve public confidence in the legal profession, and to maintain and enforce the highest possible professional standards for members of the bar. (*Jackson* v. *State Bar, supra*, 23 Cal.3d at p. 514.) When an attorney violates his professional duties, disciplinary measures may be appropriate even absent any intentional dishonesty. (E.g., *Doyle, supra*, 15 Cal.3d at p. 978.) As reviewed above, there is ample evidence to support the finding that petitioner's actions were both unprofessional and unethical. The recommended discipline is not excessive.

### a. *Restitution*

■ Petitioner argues he should not be required to pay restitution because the examiner failed to prove that Pollock did not perform any services for the DeMerses that might entitle Pollock to keep part of the $10,000. This claim ignores the uncontradicted statement in James DeMers's declaration that Pollock had performed no services for the DeMerses. Petitioner submits no evidence to dispute the finding that Pollock did not earn any of the $10,000, and hence we reject this contention.

Petitioner also argues restitution is inappropriate because he did not profit from his wrongful conduct. Restitution is routinely required, usually without discussion, in cases of misappropriation of client funds. (E.g., *Mepham* v. *State Bar* (1986) 42 Cal.3d 943 [232 Cal.Rptr. 152, 728 P.2d 222]; *Waysman* v. *State Bar* (1986) 41 Cal.3d 452 [224 Cal.Rptr. 101, 714 P.2d 1239]; *Chasteen* v. *State Bar* (1985) 40 Cal.3d 586 [220 Cal.Rptr. 842, 709

P.2d 861].) It does not follow, however, that restitution is appropriate only in such cases, or that, because petitioner in this case did not misappropriate client funds, he should not be required to pay restitution to the victims of his culpable acts.

Although part of the rationale for requiring restitution may be to prevent an attorney from profiting from his wrongdoing, restitution is also intended to compensate the victim of the wrongdoing, and to discourage dishonest and unprofessional conduct. As we noted in *Alberton, supra*, "this court should have the power to impose discipline which encourages attorneys to act honestly and with integrity." (37 Cal.3d at p. 7, fn. 4.) (See also *Galardi, supra*, 43 Cal.3d at pp. 694-695 [requiring $186,000 in restitution to attorney's coventurers, notwithstanding lack of any attorney-client relationship.]) In *Bate* v. *State Bar* (1983) 34 Cal.3d 920, 924 [196 Cal.Rptr. 209, 671 P.2d 360], where the attorney had misappropriated $2,221 of client funds, we held that the recommended discipline was "inadequate because it does not require restitution." Citing our concern for the protection of the public and the maintenance of high standards of professional conduct, we added the requirement of restitution to the attorney's discipline. (*Id.*, at pp. 924-925.) Similarly, we believe that a requirement of restitution in this case will not only protect the public, but also serve to further the integrity of the profession and encourage high professional standards of conduct. We agree with the review department recommendation and find that restitution is an appropriate condition of probation.

b. *Actual suspension*

■ Petitioner argues he should not be actually suspended from practice for any period of time. He contends, without elaboration, that his conduct was "less serious" than that of attorneys in prior cases in which we did not order actual suspension. (E.g., *Palomo, supra*, 36 Cal.3d 785.) We are not convinced. As detailed above, petitioner participated in a client's scheme to defraud. In *Palomo*, by contrast, the attorney received a check payable to a client, indorsed the client's name without his consent, and failed to notify the client of his receipt of the check. The check was deposited in his firm's payroll account. When the client inquired about the money, the attorney forwarded him the funds plus interest within three weeks. We cautioned in *Palomo* that the recommended discipline of one year probation, with no actual suspension, was "lenient," and that the attorney's "conduct warrants *at least*" the discipline recommended. (36 Cal.3d at p. 797, italics added.) We adopted the recommendation, in part because of

the attorney's payment of restitution before any State Bar involvement in the matter. (*Id.*, at p. 798.)

Although the facts of the present case are unusual, we find that a 90-day term of actual suspension is not excessive, nor is it disproportionate compared with the discipline imposed in previous cases. (See, e.g., *Brody* v. *State Bar* (1974) 11 Cal.3d 347, 350 [113 Cal.Rptr. 371, 521 P.2d 107] [single incident of failure to maintain client trust account properly, commingling and misappropriation, with failure to make restitution despite inquiries from client; we ordered one year actual suspension]; *Walter, supra,* 2 Cal.3d at p. 891 [attorney who misappropriated client funds made voluntary restitution of the entire amount in question, but we nevertheless ordered two years probation with six months actual suspension]; *Hallinan, supra,* 33 Cal.2d 246 [approving three months actual suspension for attorney who had simulated client's signature, despite the fact that client did not object and no money was lost].)

3. *Mitigating Factors*

 Petitioner argues the mitigating factors, as listed by the hearing panel, compel less severe discipline than that recommended. We discuss each of the asserted mitigating factors in turn.

The panel found petitioner had no prior record of discipline. This may constitute a mitigating factor in an appropriate case. If an attorney has practiced law only a short time, however, lack of a prior record is "not a strong mitigating factor." (*Smith* v. *State Bar* (1985) 38 Cal.3d 525, 540 [213 Cal.Rptr. 236, 698 P.2d 139].) In *Smith,* lack of prior discipline did not greatly influence our review, because "petitioner had been in practice only six years at the time of the misconduct." (*Ibid.*; see also *Rosenthal, supra,* 43 Cal.3d at p. 664.) In the present case, petitioner opened the trust account at issue only three years and three months after he was admitted to the bar. His lack of prior discipline therefore is not entitled to great weight.

 The hearing panel also found petitioner's "emotional difficulties" to be a factor in mitigation. Yet emotional or "psychological disability, while it may ameliorate the moral culpability of an attorney's misconduct, does not immunize him from disciplinary measures necessary to protect the public." (*Palomo, supra,* 36 Cal.3d at p. 797.) We have held, "Psychoneurotic problems are not a mitigating factor in bar disciplinary

proceedings, where the goal is protection of the public." (*In re Vaughn* (1985) 38 Cal.3d 614, 619 [213 Cal.Rptr. 583, 698 P.2d 651].)

■ The panel listed lack of harm to petitioner's clients as a mitigating factor, but as we have noted, an attorney has an ethical responsibility to the public, including his clients' creditors, as well as to his clients. In light of our goals of protecting the public, and promoting the integrity of the profession, we cannot attach great weight to this factor.

Petitioner's "good faith" is asserted as a factor in mitigation, but because he admittedly knew Pollock intended to use the trust account to conceal funds from creditors, and knowingly relinquished total control of the account to Pollock, we find this factor unpersuasive. Similarly, considering the avowed purpose of the account, we do not give great weight to the panel's finding of petitioner's "good character," especially in light of the lack of any references attesting to said good character or any other supporting evidence in the record. Finally, petitioner's cooperation with the State Bar, and his stated remorse, are both factors in mitigation here, but in light of all the circumstances of this case, we find that the recommended discipline is not excessive. Indeed, three review department referees deemed the recommended degree of discipline "insufficient." We conclude the mitigating factors do not warrant reducing the discipline to less than that recommended by the review department.

## IV. CONCLUSION

We adopt the recommended discipline of the review department, and order that: (1) petitioner be suspended from the practice of law for two years; (2) execution of the suspension be stayed; and (3) petitioner be placed on probation for said two years on condition that he be actually suspended for the first ninety days of said probation, and that he comply with all other conditions of probation recommended by the review department, as set out in its decision filed April 16, 1987. The further conditions specified by the State Bar include: payment of restitution in the amount of $10,000 plus interest to the DeMerses within the first year; filing of quarterly reports with the State Bar regarding his compliance with the terms of his probation and the status of his client trust accounts; and obtaining psychiatric or psychological help. In addition, we order that petitioner comply with the provisions of California Rules of Court, rule 955, and that he perform the acts specified in subdivisions (a) and (c) of the rule within 30 and 40 days, respectively, after the effective date of this order. We further order that

petitioner take and pass the Professional Responsibility Examination within one year of the effective date of this order. (*Segretti* v. *State Bar* (1976) 15 Cal.3d 878, 891, fn. 8 [126 Cal.Rptr. 793, 544 P.2d 929].) This order is effective upon finality of this decision.

Petitioner's application for a rehearing was denied April 20, 1988,