[No. S010803. Mar. 15, 1990.]

MIGUEL GADDA, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

## COUNSEL

Edward S. Levinson for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., Richard J. Zanassi and Patricia Cummings for Respondent.

## OPINION

**THE COURT.\***—We review the recommendation of the Review Department of the State Bar Court that petitioner Miguel Gadda be suspended from the practice of law for two years, that his suspension be stayed, and that he be placed on probation for three years. Among other specified conditions, this recommended probation includes actual suspension for at least six months, and extends until petitioner furnishes satisfactory evidence of restitution. Petitioner challenges several of the State Bar's findings of fact and conclusions of law and maintains the recommended discipline is disproportionate to the offenses committed. After reviewing the record, we conclude the State Bar's findings and proposed sanctions are justified and adopt its recommendation.

---

\*Before Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Eagleson, J., Kennard, J., and Kline (J. Anthony), J.†

†Presiding Justice, Court of Appeal, First Appellate District, Division Two, assigned by the Chairperson of the Judicial Council.

## I. FACTS

Petitioner was admitted to the California Bar in August 1975 and has no prior record of State Bar discipline. Since his admission, approximately 90 percent of his practice has involved immigration law. According to petitioner, at the time of these proceedings his office employed nine attorneys as "independent contractors" who divided all fees equally with him in return for his providing office space and support staff. The present proceedings stem from four separate matters described below.

### A. *The Cabrera Matter*

Oscar Cabrera retained petitioner in June 1983 to obtain "green cards" (i.e., permanent resident alien identification) for his wife and children, who wished to enter the United States from El Salvador. According to petitioner, he attempted to contact the Immigration and Naturalization Service (INS), but received no response. He then had an acquaintance at the INS check its computer, which supposedly disclosed Cabrera's wife had been granted permanent residence status. Petitioner assumed a green card must have been issued, but had somehow been lost in the mail; however, he never checked the accuracy of this assumption by filing an appropriate form with the INS.

Cabrera testified he attempted to reach petitioner by telephone several times in June and July, but petitioner never returned his calls. Sometime in August, Cabrera went to petitioner's office to learn what progress had been made. According to Cabrera, petitioner instructed him at that meeting to inform the United States consulate in El Salvador that his family had lost their green cards. When Cabrera responded that his family had never received green cards, petitioner assured him that it was proper to say that they had, because the INS computer showed the Cabreras as having permanent resident status.

Cabrera testified his wife relied on this advice and lied as instructed. When the consul later discovered the misrepresentation, he threatened Cabrera's family with disciplinary action. Only after Congresswoman Burton intervened on Cabrera's behalf by contacting the INS and the consulate were the Cabreras allowed to fill out new immigration applications. Mrs. Cabrera and the children were permitted to return to the United States in May 1984, approximately 11 months after petitioner had been hired. During the course of petitioner's representation the Cabreras incurred $525 in legal fees and expenses.

## B. *The Martinez Matters*

Elias Martinez retained petitioner in two unrelated matters. In September 1980, Martinez requested petitioner file a "fifth preference" visa application with the INS.[1] According to Martinez, when he returned later that same month to check the status of the application, petitioner told him everything was "fine." Petitioner, however, did not actually file the application until May 5, 1981, approximately seven months later.

Martinez engaged petitioner a second time after Martinez's wife and three children arrived from Nicaragua and were threatened with deportation by the INS. Initially petitioner told the Martinezes they had no available defense. After Mr. Martinez confronted petitioner with the opinion of another attorney who believed Mrs. Martinez could successfully challenge the deportation order, petitioner agreed to accept the case. On May 12, 1981, petitioner advised the Martinezes that he would file an application for political asylum on their behalf; Mr. Martinez filled out the application that same day in petitioner's office. Petitioner never filed the application.

An exclusion hearing was set for August 24, 1981. Approximately five minutes before this hearing, petitioner saw Walter Pineda leaving the building in which the hearing was to take place. Pineda worked in petitioner's office as an "independent contractor," having been admitted to the bar less than four months previously. Petitioner introduced Pineda to the Martinezes. According to Pineda, petitioner then asked him to do petitioner a "favor" and represent the Martinezes at the hearing. Pineda protested. He reminded petitioner that he had never conducted an exclusion hearing, and was not familiar with the case file. Explaining that the hearing was only a summary master calendar proceeding, petitioner assured Pineda he need only remember the acronym "ASS": request "*A*sylum, *S*ixty days' continuance, and assignment of a *S*panish interpreter."

Pineda represented the Martinezes as told. The "summary master calendar," however, turned out to be a complete three-hour hearing on the merits. At the end of the hearing the immigration judge granted the Martinezes 30 days to file an application for political asylum and criticized counsel for not having done so earlier. Pineda returned to the office, delivered the Martinez file to petitioner and advised him of the proceeding and the need to file an application for asylum within 30 days. Again petitioner did not file the application.

---

[1] Martinez was eligible for a fifth-preference visa pursuant to 8 United States Code section 1153(a)(5) (brothers and sisters of United States citizens are fifth in order of preference for receiving visas), because his brother is a United States citizen.

In January 1982, the immigration judge found Mrs. Martinez had waived her right to asylum and ordered her and her children deported. Petitioner appealed that decision to the Board of Immigration Appeals, but the board upheld the immigration judge's decision, noting that no application for asylum had been made. Without explaining that he had neglected to file the asylum application, petitioner simply informed the Martinezes that the petition had been denied. (Indeed, Mr. Martinez testified he received this information only after he initiated contact with petitioner.) Assuring the Martinezes that everything was nevertheless in "working order," petitioner promised to file a motion to reopen the case.

However, everything was not in "working order." On October 5, 1983, Mrs. Martinez received a deportation notice, ordering her to report to the Office of the Immigration Judge on October 20, 1983. Petitioner received a copy of the order, but made no effort to contact the Martinezes. When Mr. Martinez went to petitioner's office, petitioner stated he would assist in halting the deportation for an additional $4,000. Mr. Martinez then wrote a check for $1,000, bringing the total legal fees paid to $1,850. Petitioner thereafter agreed to appear at the immigration judge's office on the date scheduled for Mrs. Martinez's deportation to help explain the circumstances, but he failed to appear.

Mrs. Martinez was forced into hiding to avoid deportation. Later the Martinezes hired Attorney (now Immigration Judge) Dana Marks Keener, who successfully petitioned to reopen the case.

C. *The Amnesty Law Letter*

In July 1984, petitioner mailed between 500 and 800 letters to past and present clients declaring that Congress had passed the Simpson-Mazzoli Amnesty Act.[2] The purpose of this letter was to advertise petitioner's availability to provide legal advice regarding the new law. Believing other attorneys had sent similar letters, petitioner felt the correspondence necessary to maintain his immigration law clientele. Petitioner based his letter on a San Francisco Examiner newspaper headline, without conducting his own research to verify that Congress had indeed passed the bill. In fact the bill did not pass until November 6, 1984. When petitioner realized his error, he attempted to call some of his more active clients. According to petitioner, approximately 10 people inquired about the advertisement by telephone and 4 people visited his office.

---

[2] Currently known as the Immigration Reform and Control Act of 1986 (8 U.S.C. § 1101 et seq.), this legislation extensively revised the laws controlling the flow of legal and illegal immigration and authorized granting legal status to aliens residing in the United States prior to January 1, 1982.

## II. THE STATE BAR RECOMMENDATION

The Review Department of the State Bar Court unanimously adopted (11-0) virtually all the hearing panel's findings of fact and conclusions of law. As to the Cabrera matter, both panels determined petitioner caused an intentional misrepresentation to be made to the American consul in El Salvador, thereby violating his oath to faithfully discharge his duties as an attorney (Bus. & Prof. Code, § 6067)[3] as well as his obligation not to mislead or act inconsistently with the truth (§ 6068, subd. (d)). The hearing panel also found petitioner violated section 6068, subdivision (m), by failing to respond to reasonable status inquiries by Cabrera, but the review department failed to adopt that finding.

In the Martinez matters both the review department and the hearing panel agreed: (1) Pineda was petitioner's employee, and therefore petitioner violated sections 6067 and 6103 and former rule 6-101(2) by not taking responsibility for Pineda's supervision; (2) the unreasonable delay in filing Martinez's fifth-preference application violated former rule 6-101(2);[4] (3) assigning Pineda to a case he was unqualified to handle violated former rule 6-101(2); (4) the failure to file the petition for asylum violated former rule 6-101(2); and (5) falsely telling the Martinezes that the unfiled petition for asylum had been denied violated his oath of office (§ 6067) and his duty as an attorney (§§ 6068, 6103).

Finally, the review department and the hearing panel concluded petitioner's amnesty law letter contained an untrue statement regarding his availability for employment and thereby violated former rule 2-101(A)(1).

In aggravation, the State Bar Court observed that petitioner committed multiple acts of wrongdoing, several of which demonstrated dishonesty and concealment. Moreover, it found petitioner refused to take responsibility for the injury and inconvenience suffered by the Martinezes, and failed to exercise adequate supervision of his employed attorneys. On the other hand, the State Bar Court noted mitigating facts include petitioner's lack of prior discipline and his pro bono work.

The hearing panel recommended petitioner pay restitution to the Cabreras and Martinezes, pay the costs of the disciplinary proceeding, and

---

[3] Unless otherwise noted, all "section" citations are to the Business and Professions Code; all "rule" citations are to the State Bar Rules of Professional Conduct; and all "standard" citations are to Rules of Procedure of the State Bar, division V, Standards for Attorney Sanctions for Professional Misconduct.

[4] The hearing panel determined petitioner's erroneous advice that Mrs. Martinez's deportation could not be challenged also supported its finding that petitioner violated former rule 6-101; however, the review department omitted this determination from its conclusions of law.

be actually suspended for six months, followed by an eighteen-month probation. The review department would require a two-year stayed suspension and a three-year probation, including actual suspension for at least six months and until petitioner pays restitution.

### III. Sufficiency of Evidence and Conclusions of Law

Petitioner challenges several of the State Bar's findings of fact and conclusions of law. ■ As we stated in *Berry* v. *State Bar* (1987) 43 Cal.3d 802, 810 [239 Cal.Rptr. 121, 739 P.2d 1289], "Findings of the hearing panel, adopted by the review department, are not binding on this court, and we will weigh the evidence and determine its sufficiency, but the findings will be given great weight, particularly as to credibility of witnesses who have given conflicting testimony."

■ First, petitioner asserts there is no proof he caused an intentional misrepresentation to be made to the American consul in El Salvador: He contends Cabrera's "bald statements" are insufficient to support such a finding. The hearing panel, however, had the opportunity to observe Cabrera's demeanor and sincerity. Cabrera testified petitioner specifically advised him that his wife should tell the consul she lost her green card. Petitioner fails to suggest any motivation for Cabrera to lie under oath. Furthermore, Cabrera's testimony indicates more than a simple misunderstanding. According to Cabrera, when he questioned petitioner about stating a mistruth to the consul, petitioner responded, "[It is] none of our business why [the INS] never sent [the green cards] and . . . it would be better if [Mrs. Cabrera] said she had lost them." Such testimony certainly supports the factual finding that petitioner made an intentional misrepresentation.

■ With respect to the first Martinez matter, petitioner admits that he did not file the fifth-preference application as promptly as possible; he submits, however, that a five- and one-half-month delay does not constitute a violation of former rule 6-101(2).

The record discloses petitioner actually delayed filing the petition for almost seven months. Furthermore, petitioner himself stressed the urgency of establishing an early priority date in a fifth-preference visa application. He testified that visas are issued based upon the chronological receipt of petitions and admitted that a priority date could not be set before the fifth-preference application was filed. He also conceded that the length of the waiting list depends on the country of origin; because Central American countries are generally oversubscribed, individuals from that region usually have a longer wait. Thus, a seven-month delay in obtaining a priority date

could cause a commensurately longer delay in the application process, depending on the influx of applicants from that region. The delays that petitioner seeks to minimize resulted in Mr. Martinez's inability to enjoy the privileges of resident status. The State Bar could reasonably find that the unnecessary wait constituted a lack of diligence and competence under former rule 6-101.

Third, although now admitting he did not properly supervise Pineda,[5] petitioner contends he should be exonerated in the Martinez asylum matter because the State Bar did not find that Pineda breached any duties.

Contrary to petitioner's assertions, ample evidence suggests that he, and not Pineda, was the attorney of record in the Martinez matter, at least until the appeal was taken. Both Pineda and Mrs. Martinez believed petitioner was responsible for the case. In describing the exclusion hearing, Mrs. Martinez testified, "I was frankly quite taken aback, because it was my understanding, and I felt that [petitioner] was our lawyer. We had discussed this situation amply with him. I had given him all the details . . . [and] suddenly we were being shunted off to somebody else whom I didn't even know." Likewise, Pineda's actions, such as returning the client files to petitioner, demonstrated his belief he was performing only a temporary "favor" for petitioner in handling a single hearing. In short, petitioner cannot relinquish responsibility for the Martinez case simply by punting the file downfield to whoever catches it. Moreover, even if petitioner were not the attorney of record, he certainly had a duty to communicate this fact to the Martinezes in light of their reasonable belief to the contrary. (See *Butler* v. *State Bar* (1986) 42 Cal.3d 323, 329 [228 Cal.Rptr. 499, 721 P.2d 585].)

More importantly, we reject petitioner's contention that a supervising attorney can be found only as blameworthy as the associate he or she supervises. Former rule 6-101, as well as its revised counterpart (rule 3-110), recognize that some attorneys, especially those newly admitted to the bar, may not have sufficient learning and skill to act competently on their own. These rules, therefore, encourage such unskilled lawyers to associate with, and be supervised by, other competent attorneys. The State Bar determined petitioner violated this duty of supervision by not taking responsibility for Pineda's actions and by assigning him to conduct a hearing he was unqualified to handle without supervision. (See *Crane* v. *State Bar* (1981) 30 Cal.3d 117, 122-123 [177 Cal.Rptr. 670, 635 P.2d 163] ["An attorney is responsible for the work product of his employees which is performed pursuant to his direction and authority."].) This duty of supervision is

---

[5] Before the State Bar petitioner testified he accepted no responsibility for the political asylum matter.

separate and distinct from the underlying duties of a novice attorney to act competently; it is, therefore, irrelevant that the State Bar failed to hold Pineda culpable as well.

## IV. DISCIPLINE

■ The purpose of attorney discipline is not to punish the errant attorney, but to protect the public, the courts and the legal system. (*Bach* v. *State Bar* (1987) 43 Cal.3d 848, 856 [239 Cal.Rptr. 302, 740 P.2d 414].)
■ There is no fixed formula guiding our determination of the appropriate discipline. (*In re Larkin* (1989) 48 Cal.3d 236, 244 [256 Cal.Rptr. 90, 768 P.2d 604].) Rather, we examine the totality of the circumstances, including mitigating and aggravating factors and the nature of the charged offense in light of the policy of protecting public confidence in the legal profession. (*Ibid.*) In determining the appropriate sanction, we give great weight to the review department's recommendation (*Berry* v. *State Bar, supra*, 43 Cal.3d 802, 815) and petitioner bears the burden of proving that this recommendation is erroneous (*Coppock* v. *State Bar* (1988) 44 Cal.3d 665, 682 [244 Cal.Rptr. 462, 749 P.2d 1317]). Nevertheless, we must independently examine the record and exercise our own judgment. (*Levin* v. *State Bar* (1989) 47 Cal.3d 1140, 1147 [255 Cal.Rptr. 422, 767 P.2d 689].)

■ Petitioner has failed to demonstrate that the recommended discipline is inappropriate.[6] Each of petitioner's acts of misconduct occurred during the practice of law, and is especially likely to undermine public confidence in the legal system. (See std. 2.3 [discipline for intentional dishonesty dependent, inter alia, on relation of attorney's acts to practice of law].)

First, petitioner committed several acts of client neglect, each with potentially serious consequences. Then Attorney Keener, who subsequently petitioned to reopen the Martinez asylum application, testified she accepted the case because, "[a]sylum cases are probably the most sensitive cases that the field of immigration deals with. They are like death penalty cases. And I was personally outraged that [the Martinezes] had been led to believe that an application had been filed when it had not been, especially because of the immigration service's extremely hard line position, which makes it virtually

---

[6]Section 6106 makes clear petitioner can be disbarred or suspended as a result of his repeated dishonest conduct. That section states, inter alia: "The commission of any act involving moral turpitude, dishonesty or corruption, whether the act is committed in the course of his relations as an attorney or otherwise, and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or suspension." Yet, neither section 6106 nor the Rules of Procedure of the State Bar, division V, Standards for Attorney Sanctions for Professional Misconduct prescribes a specific period of suspension.

impossible for somebody to move to reopen." Because petitioner failed to promptly file the application for political asylum, Mrs. Martinez and the children were nearly deported. His unreasonable delay in filing Mr. Martinez's fifth-preference visa application needlessly extended his client's wait to become a legal resident.

In *Carter* v. *State Bar* (1988) 44 Cal.3d 1091, 1100 [245 Cal.Rptr. 628, 751 P.2d 894], we observed that "client neglect is a serious form of misconduct which warrants substantial discipline." When disregard of clients is habitual and coupled with dishonesty or failure to communicate with a client, we have found moral turpitude constituting grounds for disbarment. (See, e.g., *Carter* v. *State Bar, supra,* 44 Cal.3d at p. 1100; *Kent* v. *State Bar* (1987) 43 Cal.3d 729, 735 [239 Cal.Rptr. 77, 739 P.2d 1244]; *McMorris* v. *State Bar* (1983) 35 Cal.3d 77, 85 [196 Cal.Rptr. 841, 672 P.2d 431].) Although petitioner's inattention to the Martinezes arguably does not rise to the level of habitualness, petitioner has also committed at least two acts of deceit and dishonesty. He knew the Cabreras had never received green cards, yet he instructed Mrs. Cabrera to misrepresent that she had lost hers. Worse still, petitioner notified the Martinezes that their application for political asylum had been denied, *when he had not even filed the application.*

Even if no harm results, such dishonest acts are grounds for suspension or disbarment. (*Garlow* v. *State Bar* (1982) 30 Cal.3d 912, 917 [180 Cal.Rptr. 831, 640 P.2d 1106].) In *Levin* v. *State Bar, supra,* 47 Cal.3d 1140, the attorney was charged with several acts of misconduct, including communicating with a party whom he knew to be represented, settling his client's case without permission, and carelessly reporting on the status of his client's case. We emphasized, however, that "no aspect of [petitioner's] conduct is more reprehensible than his acts of dishonesty. These acts manifest an abiding disregard of the fundamental rule of ethics—that of common honesty—without which the profession is worse than valueless in the place it holds in the administration of justice." (*Id.* at p. 1147, internal quotation marks omitted.)

Similarly likely to undermine public confidence in the legal profession are petitioner's untrue statements contained in the amnesty law letter. ▪ Guided by policies of consumer protection, we have observed that an attorney may willfully breach former rule 2-101(A), even when there is no specific intent to deceive or mislead. (*Leoni* v. *State Bar* (1985) 39 Cal.3d 609, 626 [217 Cal.Rptr. 423, 704 P.2d 183].) As a result of petitioner's carelessness in failing to check a newspaper article, he misled at least 14 people into believing that they might be eligible for United States citizenship.

■ We also find as aggravating petitioner's reluctance to recognize the seriousness of his misconduct and accept responsibility for his wrongdoing. Petitioner attempted to place the blame on Pineda for failing to file the petition for asylum in the Martinez matter. Indeed, his endeavor to characterize Pineda and the other associates as "independent contractors" clearly exemplifies petitioner's desire to avoid responsibility for supervising them. Moreover, the review department found petitioner demonstrated indifference throughout the proceedings. Such behavior evinces an "apparent lack of insight into the wrongfulness of his action" (*Sodikoff* v. *State Bar* (1975) 14 Cal.3d 422, 432 [121 Cal.Rptr. 467, 535 P.2d 331]), and indicates a substantial likelihood that petitioner would continue to engage in misconduct.

In mitigation, petitioner notes he has no prior record of discipline and has engaged in pro bono legal services. Normally we consider lack of prior discipline during a lengthy legal career as a point in a petitioner's favor. (*Berry* v. *State Bar, supra,* 43 Cal.3d at p. 816.) Here, petitioner had been practicing only about five and one-half years when the misconduct began; such a limited practice cannot be considered a "lengthy legal career." (Cf. *Smith* v. *State Bar* (1985) 38 Cal.3d 525, 540 [213 Cal.Rptr. 236, 698 P.2d 139] [lack of prior discipline not strong mitigating factor when attorney in practice only six years at time of misconduct].)

Petitioner's apparent zeal in undertaking pro bono work, however, does deserve mitigating weight. (*Hawk* v. *State Bar* (1988) 45 Cal.3d 589, 602 [247 Cal.Rptr. 599, 754 P.2d 1096].) Several letters and certificates from the State Bar and the Bar Association of San Francisco commend petitioner's volunteer efforts for the years 1980, 1982, 1983, and 1985. United States Immigration Judge Hornbach stressed in a letter to the State Bar that petitioner is "one of the most active participants" in the immigration court's pro bono program and that he "continuously and unselfishly contribut[es] his services to defending the indigent at deportation, exclusion and bond hearings." Although petitioner's generous volunteer work cannot obscure the fact that he has committed multiple and serious acts of misconduct, it provides further justification for adopting the recommendation of the review department, rather than imposing more severe discipline. (See *Hawk* v. *State Bar, supra,* at p. 602.)

## V. CONCLUSION

We adopt the recommended discipline of the review department, and accordingly order that: (1) petitioner be suspended from the practice of law for two years; (2) execution of the suspension be stayed; (3) petitioner be placed on probation for a period of three years, including actual suspension

for the first six months and until he furnishes satisfactory evidence of restitution to Cabrera and the Martinezes in the sums of $525 and $1,850, respectively; and (4) he comply with all other conditions of probation as set forth in the review department's decision filed April 18, 1989. These further conditions include complying with the State Bar Act and the Rules of Professional Conduct of the State Bar of California, reporting quarterly to the State Bar Court, cooperating fully with his probation referee, maintaining official State Bar membership records, and answering truthfully any inquiries made by the State Bar.

We further order that petitioner pass the Professional Responsibility Examination within one year of the effective date of this order (*Segretti* v. *State Bar* (1976) 15 Cal.3d 878, 891 [126 Cal.Rptr. 793, 544 P.2d 929]), and that he comply with rule 955(a) and (c), California Rules of Court, within 30 and 40 days respectively, after the effective date of this order.

This order is effective upon finality of this decision in this court. (See Cal. Rules of Court, rule 24(a).)