[No. S004838. Dec. 1, 1988.]

GORDON FARNHAM, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

**COUNSEL**

H. Peter Young for Petitioner.

Diane C. Yu, Truitt A Richey, Jr., Magdalene Y. O'Rourke, Richard J. Zanassi, Harriet Cohen and Erica Tabachnik for Respondent.

**OPINION**

**THE COURT.**—In this proceeding we review a unanimous recommendation of the State Bar Court that petitioner, Gordon W. Farnham, be disbarred for misconduct relating to seven separate disciplinary matters. Petitioner contends that certain findings and conclusions of the State Bar are not supported by the evidence, and that the recommendation of disbarment is unduly harsh and excessive.

Because the record portrays a clear pattern of disregard for his clients' interests, misrepresentation of his efforts on their behalf, failure to communicate with his clients and failure to return unearned fees, we adopt the State Bar's recommendation and conclude that petitioner should be disbarred.

I.

Petitioner was admitted to the practice of law in California on June 6, 1961. He has twice previously been disciplined for misconduct relating to

neglect of his clients' interests. In 1972, petitioner was suspended for three months for misconduct involving the abandonment of clients' interests in four separate matters. (Bar Misc. No. 3470.) In 1976, he was suspended for two years, stayed on conditions of probation including six months actual suspension, for engaging in a pattern of misconduct involving wilfully deceiving clients, failing to communicate with clients, abandoning clients' causes and engaging in unauthorized practice while previously suspended. (*Farnham* v. *State Bar* (1976) 17 Cal.3d 605 [131 Cal.Rptr. 661, 552 P.2d 445].) In 1979, petitioner was assessed two additional years of probation for failure to file probation reports.

## II.

The instant disciplinary proceeding originally involved nine separate client matters. Notices to show cause were issued on January 24, 1986, charging petitioner with professional misconduct in his representation of Home Federal Savings and Loan Association, and on December 5, 1986, alleging misconduct in his dealings with five clients: Frank and Karen A., Carol Robbins, Bennie Murphy, Roberta Thomas and Brenda Jents. On December 23, 1986, by stipulation of the parties, the charges in the two notices were consolidated with three other matters which had not reached the formal notice stage; on February 25, 1987, the State Bar filed a statement of facts in lieu of formal notice alleging misconduct as to three additional clients: Marian Nugent, Sandra L. Holsapple and Jerome Bellinger.

A hearing on all of the charges was conducted before a hearing panel consisting of a single referee on February 26 and 27, March 27, and May 8, 1987. On June 15, 1987, the hearing panel issued its decision finding petitioner to be culpable in seven of the nine matters, and the evidence to be insufficient to support the charges in two—the Roberta Thomas and Brenda Gents matters.[1] On October 20, 1987, the review department issued a unanimous decision adopting, with certain modifications, the hearing panel's findings of fact. Although it made its own conclusions of law, the review department, in accord with the views of the hearing panel, unanimously recommended that petitioner be disbarred.

## III.

Petitioner contends the evidence is insufficient to support the findings in six of the seven matters on which the State Bar found him to be culpable. For simplicity, we shall address each matter separately, summarizing the

---

[1] Only those findings and conclusions relating to the seven matters which form the basis of the recommended discipline will be discussed herein.

State Bar's findings as to each, and evaluating petitioner's objections thereto in light of the following principles. ■ In attorney disciplinary matters we independently examine the record, reweigh the evidence and pass on its sufficiency. (*Franklin* v. *State Bar* (1986) 41 Cal.3d 700, 708 [224 Cal.Rptr. 738, 715 P.2d 699]; *Codiga* v. *State Bar* (1978) 20 Cal.3d 788, 796 [144 Cal.Rptr. 404, 575 P.2d 1186].) However, the findings of the State Bar are entitled to great weight and are presumed to be supported by the record. (*Coppock* v. *State Bar* (1988) 44 Cal.3d 665, 677 [244 Cal.Rptr. 462, 749 P.2d 1317].) The burden falls upon petitioner to show that the findings are not supported by convincing proof to a reasonable certainty, or that the decision is erroneous or unlawful. (*Ibid.*)

1. *The Home Federal Savings and Loan Matter*

Petitioner testified that from about 1980 to 1986 he had handled 10 or 11 collection matters for the credit card department of Home Federal Savings and Loan (Home Federal). He was not paid a retainer by Home Federal, but rather was paid a fixed fee upon presenting evidence to the credit card department that he had filed an action in a particular matter.

Robert Mercado, legal counsel for Home Federal, testified that petitioner was referred to him by the credit card department to handle a collection matter under the aegis of the legal department, apparently a separate office from the credit card department. After a telephone conversation in which petitioner agreed to take the case, Mr. Mercado formally retained him by letter dated November 11, 1981, to file an action against Gary Charleston and others for monies owed to Home Federal. The letter was sent to petitioner at a Pine Boulevard address in Tustin. This letter was followed by a letter from Mercado dated November 17, 1981, also sent to the Pine Boulevard address, providing petitioner with a check for $300 as a retainer.

Mr. Mercado testified that two months later, in January 1982, he telephoned petitioner for an update on the lawsuit. Petitioner told him that he had filed the complaint and served some of the defendants. Several months later, in a letter dated April 5, 1982, and addressed to petitioner at the Pine Boulevard address, Mr. Mercado requested a copy of the complaint which petitioner said he had filed against Charleston. Mr. Mercado did not receive a copy of the complaint or any other communication from petitioner in response to this letter.

Concerned about the status of the Charleston case and other matters that petitioner was handling for the credit card department, Mr. Mercado directed his secretary, Sandra Antonoff, to get an update on all of the matters that petitioner was handling for Home Federal. Ms. Antonoff testified that

she eventually reached petitioner by phone and inquired about the status of the Charleston matter and 11 other credit card department cases. Her notes of that conversation with petitioner indicated that the Charleston matter "[s]hould go to trial in November. Farnham expects to recover our $7,000 by the end of the year." Two subsequent letters from Ms. Antonoff to petitioner in February and March of 1983 requesting an update and copies of the complaints or judgments in each of petitioner's twelve Home Federal matters, went unanswered.

In a letter to petitioner dated April 15, 1982, and sent to an Irvine Boulevard address in Tustin, Mr. Mercado informed petitioner that Home Federal no longer required his services and requested that he return all Home Federal files in his possession. Mr. Mercado did not receive the files or any other communication from petitioner in response to this letter.

In early May 1983, Mr. Mercado requested that another attorney, Wilfred E. Briesemeister, substitute as attorney of record in the Charleston matter. In a sworn declaration, Mr. Briesemeister stated that he sent a letter to petitioner informing him that he had been authorized to substitute as attorney of record, and requesting that he send him all pleadings, correspondence and other documents in the matter. Receiving no response to his letter, Mr. Briesemeister telephoned petitioner's office a number of times and left messages, but received no response.

In a letter to petitioner dated July 20, 1983, sent by certified mail to the Irvine Boulevard address, Mr. Mercado advised petitioner that Home Federal's files should be turned over to Mr. Briesemeister and that failure to respond would result in a referral of the matter to the State Bar. The files were not received by either Mr. Briesemeister or Mr. Mercado.

Petitioner testified that his office had been located on Irvine Boulevard in Tustin since 1974 and that he had never had an office or received mail at Pine Boulevard. Nevertheless, petitioner acknowledged that he had received both the letter of November 11, 1981, retaining him in the Charleston matter and the letter of November 17, 1981, containing the $300 retainer— both of which were addressed to Pine Boulevard.

Petitioner further testified that, to the best of his recollection, he had filed an action against Charleston but could not recall the county in which it had been filed. Petitioner stated that he had retained an attorney service to locate the court file, but could not recall the name of the attorney service. At the time of the hearing, the file had not been located.

Petitioner also testified that his last conversation with Mercado was in November 1981, when the latter retained his services in the Charleston

matter. He did not recall having received Mercado's letters of April 5, 1982 (requesting a copy of the Charleston complaint) or April 15, 1983 (terminating his services), but did acknowledge having received the letter of July 20, 1983, directing that he turn over his files to Mr. Briesemeister. Petitioner stated that he sent Briesemeister whatever he had in his files.

Petitioner denied having ever spoken with Ms. Antonoff or having received any of her letters requesting an update on the status of the Home Federal collection matters.

Petitioner stated that his chief contact in the legal department was Denise Batacceli, a paralegal no longer employed by Home Federal, to whom he regularly gave status reports. The State Bar stipulated that petitioner had, in fact, completed and furnished the credit card department with status reports on five matters.

Based on the foregoing, the hearing referee found that petitioner knowingly and falsely informed Home Federal he had filed a complaint in the Charleston matter; took no substantial action in the Charleston matter; wilfully failed to use reasonable diligence and his best judgment to accomplish, with reasonable speed, the purpose for which he was employed; wilfully failed to respond to numerous written and telephonic attempts to ascertain the status of the Charleston case and other collection matters; wilfully failed and refused to return Home Federal's files when so requested; and wilfully failed and refused to promptly deliver property to which his client was entitled.

Based on the foregoing findings, the review department concluded that petitioner violated his oath and duties as an attorney as prescribed in Business and Professions Code sections 6067, 6068 and 6103; committed acts of moral turpitude and dishonesty as defined in Business and Professions Code section 6106; and violated rules 6-101(A)(1), 2-111(A)(2) and 8-101(B)(4) of the Rules of Professional Conduct.

Petitioner's various challenges to the State Bar findings and conclusions are more an attempt to recharacterize the evidence than to discredit its sufficiency. Petitioner does not deny that he failed to provide the status reports and case files as requested, but asserts that he was the victim of "an interdepartmental reshuffling of responsibility" between the credit card and the legal departments at Home Federal. As outlined above, however, the State Bar findings are supported by overwhelming evidence. There is no evidence that petitioner was misled by anyone at Home Federal, or that petitioner's misconduct was anyone's fault other than his own.

Petitioner further characterizes the Charleston matter as a "worthless case," labels Home Federal's recordkeeping a "quagmire" and obliquely refers to an alleged "misdirection" of letters. The "worth" of the case, however, was not petitioner's to judge; the recordkeeping was sufficient to create a record replete with unanswered letters from Mr. Mercado, Ms. Antonoff and Mr. Briesemeister; and at least two of the allegedly misdirected letters were nevertheless received by petitioner.

We conclude, in sum, that the evidence establishes petitioner's guilt by convincing proof to a reasonable certainty. (*Price* v. *State Bar* (1982) 30 Cal.3d 537, 547 [179 Cal.Rptr. 914, 638 P.2d 1311].)

2. *The Frank and Karen A. Matter*

Karen A. testified that she and her husband, Frank, hired petitioner in May 1982 to handle Frank's adoption of Karen's daughter from a prior marriage. Karen stated that the terms of the oral agreement provided for a flat fee of $200, of which $100 was payable in advance and $100 was payable upon completion of the adoption. Petitioner informed her that the adoption should take no longer than six to eight months to complete, since the natural father had abandoned the child.

The A.'s paid $100 in advance on May 19, 1982, and provided petitioner with the necessary documents to proceed with the adoption. Court records indicate that petitioner filed the petition for adoption on May 25, 1982, and filed a consent to adopt and probation report on September 13, 1982. That same month, the A.'s received a bill and a cover letter from petitioner indicating that they owed a balance of $100 payable immediately. Consistent with their understanding of the fee agreement, however, the A.'s refused to pay the balance until completion of the adoption.

In early 1983, the A.'s became concerned because the matter was taking longer than the six to eight months that petitioner had estimated. Frank A. testified that he made numerous calls to petitioner to inquire as to the status of the case but in most cases was unable to reach him or failed to get a return call. At one point, petitioner informed the A.'s that a hearing date had been set for February 3, 1984. The A.'s had to cancel that date because their daughter became ill. Petitioner stated that he would schedule a new date, but he failed to do so. According to a declaration of the clerk of the superior court, no hearing dates had been set in the matter.

In subsequent conversations with petitioner Mr. A. requested copies of the documents in his file, but he did not receive them. In a letter to petitioner dated August 6, 1984, sent by certified mail, the A.'s reviewed the events

that had occurred to date and stated that if petitioner failed to contact them forthwith the matter would be referred to the State Bar. The A.'s did not receive a response to their letter.

Petitioner testified that he had agreed to handle the adoption for a total of $200 with $100 payable in advance and the balance due within two or three months. He stated that he did not finish the adoption because a fee dispute developed over payment of the $100 balance. He did not return the file because Mr. A. said he was going to get another attorney and petitioner said "well, [let's] file a substitution of attorney . . . ."

Petitioner acknowledged he did not notify the A.'s that he was withdrawing as attorney of record, nor did he notify the court that he was no longer attorney of record.

The hearing referee found that petitioner timely filed the petition for adoption but thereafter wilfully failed to take further substantial action or to use reasonable diligence and his best efforts to accomplish the purpose for which he was employed. The referee also found that petitioner wilfully failed and refused to return the A.'s file.

Based on the foregoing findings, the review department concluded that petitioner wilfully violated his oath and duties as an attorney as prescribed in Business and Professions Code sections 6068 and 6103, engaged in conduct involving moral turpitude as set forth in Business and Professions Code section 6106, and wilfully violated rules 6-101(A)(2) and 2-111(A)(2) of the Rules of Professional Conduct.

Petitioner contends that the findings are not supported by clear and convincing evidence. He maintains that the A.'s version of the events is "unreasonable" and that his actions in retaining the file and withdrawing as attorney were reasonable in light of the fee dispute.

Although, as previously noted, the standard of review in disciplinary matter requires that we consider the evidence independently, we assign substantial weight to the findings below, particularly when based on conflicting testimony. (*Dixon* v. *State Bar* (1982) 32 Cal.3d 728, 736 [187 Cal.Rptr. 30, 653 P.2d 321].) The hearing panel was in a superior position " ' "to evaluate conflicting statements after observing the demeanor of the witnesses and the character of their testimony." ' " (*Ibid.*, quoting *Himmel* v. *State Bar* (1971) 4 Cal.3d 786, 794 [94 Cal.Rptr. 825, 484 P.2d 993]; accord *Gallagher* v. *State Bar* (1981) 28 Cal.3d 832, 838 [171 Cal.Rptr. 325, 622 P.2d 421].)

Applying these principles, we find that the evidence, viewed independently, is more than sufficient to establish petitioner's guilt to a reasonable certainty. (*Coppock* v. *State Bar, supra,* 44 Cal.3d at p. 677; *Price* v. *State Bar, supra,* 30 Cal.3d at p. 547.)

3. *The Robbins Matter*

Carole Robbins retained petitioner in October 1983 to represent her in a dissolution of marriage. Pursuant to an oral agreement, she paid him $500 in fees and costs.

Petitioner filed the petition for dissolution in Orange County Superior Court on October 12, 1983, and had Mr. Robbins served in Oregon one week later.

Ms. Robbins testified that she was told by petitioner her matter was set for hearing on a date in February 1984. According to Ms. Robbins, petitioner later cancelled the hearing because he claimed that he had a criminal matter scheduled that day. Petitioner then informed Ms. Robbins that a hearing had been set for March. However, petitioner again informed Ms. Robbins that he had to cancel the hearing because of a conflict with a criminal matter.

When Ms. Robbins was next able to contact petitioner, she was told that a hearing had been set for June or July. Petitioner cancelled this hearing because he was going on vacation. Another hearing date in August was cancelled because the judges were on vacation.

Ms. Robbins testified that she had planned to be married in August 1984 and therefore had to have the divorce final before then. In September, she terminated petitioner's services. Petitioner failed, however, to reimburse Ms. Robbins any of the $500 that she had paid. Indeed, petitioner informed her that she owed him over $100 in costs. Thereafter, Ms. Robbins retained another attorney. Her divorce was granted November 15, 1985.

Petitioner testified that the reason the Robbins case never came to a hearing was that the affidavit of service and summons which he sent to Oregon were returned to him as defective. Petitioner stated that he was in the process of attempting to remedy the defect at the time his services were terminated. He denied that he had ever informed Ms. Robbins of any definite hearing dates other than the first one. He acknowledged that he had not returned any of the $500 fee and costs.

The hearing referee found that Ms. Robbins had advised petitioner she planned to remarry in August 1984; that petitioner knowingly misrepresent-

ed that court dates were scheduled, wilfully failed to communicate to Ms. Robbins that he was having problems serving her husband, and wilfully failed to respond to her inquiries. The referee further found that petitioner took no substantial action on the dissolution petition and thereby wilfully failed to use reasonable diligence to accomplish, with reasonable speed, the purpose for which he had been employed. The referee also found that petitioner wilfully failed to refund the unearned fee paid to him by his client.

Based on the foregoing findings, the review department concluded that petitioner had violated his oath and duties as prescribed in Business and Professions Code sections 6068 and 6103, had engaged in conduct involving moral turpitude as set forth in Business and Professions Code section 6106, and had wilfully violated rule 6-101 (A)(2) of the Rules of Professional Conduct.

Relying principally upon his own version of the events, petitioner contends that the findings are not supported by clear and convincing evidence. Although petitioner's testimony contradicts that of Ms. Robbins, the hearing referee was clearly in a superior position to evaluate the demeanor of the two principal witnesses and the character of their testimony. (*Dixon* v. *State Bar, supra,* 32 Cal.3d at p. 736.) We conclude that petitioner's guilt is established by convincing proof to a reasonable certainty. (*Coppock* v. *State Bar, supra,* 44 Cal.3d at p. 677.)

4.  *The Murphy Matter*

Bennie Murphy retained petitioner on June 7, 1984, to handle a family law matter concerning grandparents' visitation rights. By oral agreement the total fee was to be $500 plus costs. Ms. Murphy paid petitioner a $350 retainer.

Ms. Murphy testified that petitioner's services were to include filing and serving a complaint and setting a hearing date. She requested that petitioner supply her with copies of all court papers; petitioner assured her that he would.

Thereafter, Ms. Murphy made numerous attempts to contact petitioner about a court date, without success. On July 10, 1984, petitioner called her and stated that a complaint had been filed and turned over to the marshal for service, that he did not know the status of the service, and that a hearing had been set for July 21, 1984.

Ms. Murphy received no further word from petitioner prior to the hearing. All of her attempts to contact petitioner were unsuccessful. The hearing

did not take place and Ms. Murphy continued to place calls to petitioner. She finally reached him on August 10, 1984, at which time he informed her that certain papers had not been served but that a hearing had been set for late August, and that he would get back to her. Ms. Murphy never heard from petitioner again.

By letter dated August 30, 1984, Ms. Murphy requested that petitioner either proceed with the case or return her file and retainer. Petitioner did not respond and neither the file nor the retainer was returned to her.

Petitioner stipulated that he never filed a complaint in the Murphy matter. He testified that he prepared an order to show cause and had Ms. Murphy sign it, but never filed it. When asked why, petitioner responded, "I don't know." Petitioner could not recall Ms. Murphy's request that he return her file and retainer. Petitioner stated that he felt Ms. Murphy was entitled to a refund and stated that he intended to do so.

The hearing referee found that petitioner made a knowingly false statement to Ms. Murphy regarding the court hearing; took no substantial actions in the matter; wilfully failed to perform the services for which he was retained; and wilfully failed to return her file and unearned fee as demanded by Ms. Murphy upon termination of petitioner's services.

Based upon the foregoing findings, the review department concluded that petitioner had wilfully violated his duties as an attorney as prescribed in Business and Professions Code sections 6068 and 6103; that by failing to perform services and by misrepresenting court dates petitioner had engaged in conduct involving moral turpitude as set forth in Business and Professions Code section 6106; and that on account of said conduct petitioner had wilfully violated rule 6-101(A)(2) of the Rules of Professional Conduct.

Petitioner quibbles with the hearing referee's finding as to his misrepresentation of court dates, noting that the misrepresentation occurred on July 10, 1984, rather than on June 7, 1984, as the referee found. Petitioner does not otherwise challenge the sufficiency of the evidence to support the findings and conclusions of the State Bar. We conclude that the evidence clearly and convincingly establishes petitioner's guilt to a reasonable certainty. (*Coppock* v. *State Bar, supra,* 44 Cal.3d at p. 672.)

5. *The Holsapple Matter*

On January 7, 1985, Sandra Holsapple retained petitioner to handle a postjudgment property settlement matter. Ms. Holsapple testified that she informed petitioner she was concerned about a provision in the settlement

concerning the disposition of the family home when the settlement became final. The property settlement was to become final when her last child reached the age of 18 in November 1986.

There was no written retainer. Ms. Holsapple paid petitioner a flat fee of $750.

According to Ms. Holsapple, petitioner stated that it would take six to seven months to get the required court date. After about seven months had passed, she asked petitioner about the court date. Petitioner told her that a hearing date had been set on an order to show cause to increase her alimony and that the property settlement would be taken care of at the same time. Ms. Holsapple called petitioner the night before the hearing to confirm; he told her that the date he had given her was only tentative, however, and that the hearing would be in another month or so. No hearing took place during the next several months. Petitioner then gave her another hearing date, which he described as "tentative." Three or four days prior to the supposed hearing date, Ms. Holsapple unsuccessfully tried to reach petitioner several times. Finally, petitioner's answering service told her that petitioner was in Paris.

Later, according to Ms. Holsapple, petitioner informed her that a hearing date had been set for December 17, 1985. When Ms. Holsapple called to inform petitioner that her ex-husband would be on vacation on that date, petitioner stated that he would set another date. However, no further hearing date was ever set.

By early 1986, Ms. Holsapple testified that she was becoming concerned because her son's 18th birthday was approaching. She asked petitioner why nothing had been done after a year and a half and whether he wished to continue handling the matter. Petitioner indicated that he did not know why nothing had been done, that he wished to continue with the case, and that there would be a court date in May or June. Several months passed, however, and nothing further was done. According to Ms. Holsapple, petitioner explained that he was having trouble serving her former husband. However, petitioner assured her that he would personally serve the papers.

Thereafter, Ms. Holsapple went to court to see what had been filed in her case and discovered that nothing had been filed. After numerous unsuccessful attempts to contact petitioner, Ms. Holsapple retained another attorney. She then went to petitioner's office to recover her file and also requested documentation of the services he had performed and the expenses incurred. Petitioner did not return the file or provide the documentation requested.

Later, after several additional attempts, Ms. Holsapple obtained part of her file.

Petitioner stipulated that he never made a court appearance in the Holsapple matter. He also acknowledged that he never filed any papers in connection with the matter. When asked why, he replied, "I don't know." Petitioner could not recall discussing any specific hearing dates with Ms. Holsapple.

The hearing referee found, inter alia, that petitioner knowingly made false representations to Ms. Holsappple that court dates were scheduled; wilfully failed to perform services for which he was retained; wilfully failed and refused to respond to his client's requests for the return of documents and failed to promptly deliver said documents; and wilfully failed to promptly return unearned fees.

Based on the foregoing findings, the review department concluded that petitioner violated his oath and duties as an attorney as prescribed in Business and Professions Code sections 6068 and 6103, engaged in conduct involving moral turpitude as set forth in section 6106, and wilfully violated rules 6-101(A)(2), 2-111(A)(2) and 8-101(B)(4) of the Rules of Professional Conduct.

Petitioner contends the evidence does not support the State Bar's finding that petitioner falsely told Ms. Holsapple court dates had been scheduled. Petitioner relies on Ms. Holsapple's testimony that petitioner characterized all of the supposed hearing dates as "tentative." The argument is unavailing. The evidence supports the finding that petitioner knowingly supplied false dates; characterizing the dates as tentative does not absolve the misrepresentation. We conclude the evidence clearly and convincingly establishes petitioner's guilt to a reasonable certainty.

6. *The Bellinger Matter*

Jerome Bellinger, a general contractor, retained petitioner in January 1986 to handle two matters for him. One matter was to collect $15,000 owed to Bellinger by Frank Thomas Construction; the other was to collect a $6,000 overdue loan made to Ken Cooke. A written retainer was signed but there was no discussion of fees.

Petitioner sent a letter, dated February 14, 1986, to Cooke advising that petitioner had been retained to collect the loan and warning that petitioner would bring an action if he failed to repay the loan immediately.

By declaration, Linda Cooke, Ken Cooke's wife, stated that she telephoned petitioner in response to the letter and told him that she and her husband did not owe any money to Bellinger and would contest any efforts to collect.

According to Bellinger, petitioner informed him in late February or early March that he had sent the letter to Cooke and that Cooke had said he was going to sign a note and make partial repayment of the loan. By declaration, Ken Cooke acknowledged that he had received the letter but denied that he had ever discussed repayment of the loan or any other matter with petitioner.

Petitioner testified that he had at least three or four telephone conversations with Mrs. Cooke during March or April of 1986, that she indicated a willingness to settle, but that she later refused to settle because of a subsequent dispute with Bellinger. Petitioner stated that he informed Bellinger of the Cookes' views, that Bellinger wanted to file a lawsuit, but that none was filed because he thought it would lead to nothing.

As to the second matter, in February 1986 petitioner requested and received $300 from Bellinger to proceed with the lawsuit against Frank Thomas Construction. According to Bellinger, petitioner stated that he would seek a court date and that they would probably be in court by July. Subsequently, petitioner informed Bellinger that they could not get a court date for July and that they would not go to court until September. Bellinger subsequently asked to see his file. Petitioner said in two weeks they could go over the matter. During the next several months, Bellinger repeatedly and persistently attempted to contact petitioner to get his file but was unable to do so until early October 1986 when he waited in petitioner's parking lot until petitioner drove by. After he retrieved the files, Bellinger retained another attorney to handle the Thomas Construction and Cooke matters.

Petitioner testified that he advised Bellinger to file a mechanic's lien in connection with the Thomas Construction matter and indicated that they could then foreclose on the lien. He said that Bellinger got the lien and then settled the matter. He had not advised Bellinger to settle and was not informed of the settlement.

In February 1987 petitioner refunded the $300 Bellinger had paid in connection with the Thomas Construction matter. The check was returned for insufficient funds.

The hearing referee found, inter alia, that petitioner falsely represented to Bellinger that Ken Cooke had agreed to a repayment plan and falsely

represented that a July court date had been obtained in the Thomas Construction matter; wilfully failed and refused to respond to Bellinger's numerous inquiries concerning the two matters; wilfully failed and refused to promptly return the files in these matters; never took any substantial action and failed to perform the services for which he was retained in the Cooke matter; and wilfully failed, upon his discharge, to promptly refund the unearned fee paid to him by Bellinger. The hearing referee found that petitioner did not foreclose on the mechanic's lien in the Thomas Construction matter because Bellinger had released the lien.

Based on the foregoing findings, the review department concluded that petitioner wilfully violated his oath and duties as prescribed in Business and Professions Code sections 6068 and 6103, engaged in conduct involving moral turpitude as set forth in section 6106, and wilfully violated rules 6-101(A)(2), 2-111(A)(2) and 2-111(A)(3) of the Rules of Professional Conduct.

Petitioner contends that several immaterial findings of the State Bar are not supported by clear and convincing evidence. The gist of petitioner's argument is that his testimony was "more plausible" than that of Ken or Linda Cooke. The argument is unpersuasive. (See *Dixon* v. *State Bar, supra,* 32 Cal.3d at p. 736.) Petitioner also seeks to explain his noncommunication with Bellinger on the ground that the latter was "unbelievably difficult." █ A difficult client is a fearful thing, but it does not excuse petitioner's wilful failure to respond to numerous notes and telephone calls over a period of several months. We conclude that evidence clearly and convincingly establishes petitioner's guilt to a reasonable certainty.

7. *The Nugent Matter*

Petitioner acknowledged and stipulated that he was retained by Marion Nugent to prosecute an action for damages which arose out of a real estate transaction and that he was paid a $500 retainer. Petitioner further acknowledged that he did not perform the services for which he was retained.

It was stipulated that petitioner wilfully failed to perform the services for which he was retained, wilfully failed to communicate with Ms. Nugent, and wilfully failed to return the unearned fee.

Based on these findings, the review department concluded that petitioner wilfully violated his oath and duties as an attorney as prescribed in Business and Professions Code sections 6068 and 6103, and wilfully violated rules 6-101(A)(2) and 2-111(A)(3) of the Rules of Professional Conduct. Petitioner does not challenge these findings.

## IV.

Having concluded that the evidence convincingly establishes petitioner's guilt in each of the seven matters in which the State Bar found him to be culpable, we turn to petitioner's contention that the recommended discipline of disbarment .is excessive.

■ " ' "The purpose of a disciplinary proceeding is not punitive but to inquire into the fitness of the attorney to continue in that capacity for the protection of the public, the courts, and the legal profession." ' " (*Chasteen* v. *State Bar* (1985) 40 Cal.3d 586, 591 [220 Cal.Rptr. 842, 709 P.2d 861], quoting *Bradpiece* v. *State Bar* (1974) 10 Cal.3d 742, 748 [111 Cal.Rptr. 905, 518 P.2d 337].) The discipline in each case must be determined by the particular facts and circumstances of the case. (*Ibid.*)

■ " 'Although the State Bar's recommendation as to discipline is entitled to great weight . . . we exercise our independent judgment in determining the appropriate punishment for professional misconduct . . . .' " (*Chefsky* v. *State Bar* (1984) 36 Cal.3d 116, 132 [202 Cal.Rptr. 349, 680 P.2d 82], quoting *Gordon* v. *State Bar* (1982) 31 Cal.3d 748, 757 [183 Cal.Rptr. 861, 647 P.2d 137].) " 'Our principal concern is always the protection of the public, the preservation of confidence in the legal profession, and the maintenance of the highest possible professional standard for attorneys.' " (*Ibid.*, quoting *Jackson* v. *State Bar* (1979) 23 Cal.3d 509, 514 [153 Cal.Rptr. 24, 591 P.2d 47].) "Petitioner bears the burden of demonstrating that, with due consideration to these objectives, the recommendation of the State Bar is erroneous." (*McMorris* v. *State Bar* (1983) 35 Cal.3d 77, 84 [196 Cal.Rptr. 841, 672 P.2d 431].) We conclude that petitioner has not met this burden.

■ As evidence in mitigation, the State Bar considered petitioner's willingness to cooperate with the State Bar in agreeing to consolidate all outstanding matters against him into one proceeding, and the delay in processing the Home Federal matter dating from 1982. Petitioner also seeks to mitigate the recommended discipline by reference to the fact that he is a "beleaguered solo practitioner," that he charges low fees, and that his acts allegedly did not result in financial loss to his clients. He asserts that his failings are the result of bad "management skills," and suggests a lesser discipline, coupled with a probationary monitoring system, would be a more appropriate discipline than disbarment.

Petitioner's low fees, though commendable, cannot excuse his repeated failures to perform services for his clients. Nor do petitioner's busy practice and lack of management skills constitute circumstances which substantially mitigate his misconduct. (*McMorris* v. *State Bar* (1981) 29 Cal.3d 96, 99

[171 Cal.Rptr. 829, 623 P.2d 781].) The facts demonstrate that petitioner is guilty not only of mismanagement, but of repeated misrepresentations to his clients. Moreover, as the matters described herein amply demonstrate, the harm suffered by a client as the result of an attorney's misconduct is not limited to financial losses.

■  The record here clearly shows that petitioner repeatedly and habitually disregarded his clients' interests by wilfully failing to perform services, misrepresenting the status of their cases, failing and refusing to communicate and failing to return unearned fees. This court has previously stated: " 'Habitual disregard by an attorney of the interests of clients is ground for disbarment under Business and Professions Code sections 6103 and 6106. Even when such neglect is grossly negligent or careless, rather than willful and dishonest, it is an act of moral turpitude and professional misconduct, justifying disbarment. . . .' " (*Simmons* v. *State Bar* (1970) 2 Cal.3d 719, 729 [87 Cal.Rptr. 368, 470 P.2d 352], quoting *Grove* v. *State Bar* (1967) 66 Cal.2d 680, 683-684 [58 Cal.Rptr. 564, 427 P.2d 164].) In a recent disbarment case, *McMorris* v. *State Bar, supra,* 35 Cal.3d 77, we reaffirmed these principles. " 'As we have repeatedly stated, willful failure to perform legal services for which an attorney has been retained in itself warrants disciplinary action . . . .' Moreover, habitual disregard by an attorney of the interests of his or her clients combined with failure to communicate with such clients constitute acts of moral turpitude justifying disbarment." (*Id.* at p. 85, quoting *Lester* v. *State Bar* (1976) 17 Cal.3d 547, 551 [131 Cal.Rptr. 225, 551 P.2d 841].)

In determining its recommended degree of discipline, the State Bar properly considered petitioner's prior disciplinary record.[2] As we stated in petitioner's prior disciplinary proceeding: "Petitioner's actions . . . evidence a serious pattern of misconduct whereby he willfully deceived his clients, avoided their efforts to communicate with him and eventually abandoned their causes." (*Farnham* v. *State Bar, supra,* 17 Cal.3d at p. 612.)

Thus, our observations in *Grove* v. *State Bar, supra,* 66 Cal.2d 680, are particularly pertinent here: "In view of the number of offenses of which the board found petitioner guilty, and considering his previous record, we are compelled to conclude that he engaged in an habitual course of conduct

[2] As evidence in aggravation, the State Bar also indicated that it considered (1) petitioner's inaction in the Robbins dissolution matter, which resulted in the delay of Ms. Robbins's remarriage, and (2) petitioner's failure to return the unearned fee in the Murphy matter, which resulted in her inability to retain new counsel to pursue the grandparent visitation action. Petitioner contends the evidence does not show that Ms. Robbins informed him of the scheduled August wedding. Our independent review of the record, however, reveals that the finding was supported by clear and convincing evidence.

toward his clients characterized by willful violation of his oath as an attorney. Although a few of his offenses, standing alone, might be described as merely negligent, or grossly negligent, his persistence in refusing to perform services for which he was engaged, and for which he accepted fees, can only be regarded as deliberate and willful. Petitioner habitually failed to file necessary documents for his clients, . . . misled his clients as to the status of their affairs, and avoided communications by telephone, in writing, and in person. [¶] Habitual disregard by an attorney of the interests of clients is ground for disbarment under Business and Professions Code sections 6103 and 6106." (*Id.* at pp. 683-684.)

The combined record of this disciplinary proceeding and petitioner's prior discipline shows not a series of aberrant or uncharacteristic acts, but rather " 'a continuing course of serious professional misconduct extending over a period of several years.' " (*McMorris* v. *State Bar, supra,* 35 Cal.3d at p. 85, quoting *Tomlinson* v. *State Bar* (1975) 13 Cal.3d 567, 576 [119 Cal.Rptr. 335, 531 P.2d 1119].) The risk of petitioner repeating this misconduct if he were permitted to continue in practice would appear to be considerable. (*Rimel* v. *State Bar* (1983) 34 Cal.3d 128, 131 [192 Cal.Rptr. 866, 665 P.2d 956].) As petitioner's conduct demonstrates, "the public and the legal profession would not be sufficiently protected if we merely, once again, suspended petitioner from the practice of law." (*McMorris* v. *State Bar, supra,* 35 Cal.3d at p. 85.)

Accordingly, it is ordered that petitioner be disbarred from the practice of law in this state and that his name be stricken from the roll of attorneys. It is further ordered that petitioner be ordered to comply with rule 955 of the California Rules of Court, and that he perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of this order. This order is effective upon finality of this opinion.