Filed 8/15/24  Aquino v. California Board of Registered Nursing CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| ERLINDA O. AQUINO, | |
| Plaintiff and Appellant, | E080913 |
| v. | (Super.Ct.No. CIVSB2125400) |
| CALIFORNIA BOARD OF REGISTERED NURSING, et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of San Bernardino County.  David Cohn, Judge.[1]  Reversed with directions.

Erlinda O. Aquino, in pro. per., for Plaintiff and Appellant.

---

[1]  The final judgment was signed by the Honorable Joseph T. Ortiz after the case was reassigned.

Rob Bonta, Attorney General, Carl W. Sonne, Assistant Attorney General, David E. Brice, Armando Zambrano and Artin Derohanian, Deputy Attorneys General, for Plaintiff and Respondent.

Following an administrative hearing before an administrative law judge (ALJ), the Board of Registered Nursing (the Board) revoked the registered nursing license of appellant Erlindo O. Aquino (Aquino) due to gross negligence and violating a patient's medical privacy rights. Aquino petitioned the trial court for a writ vacating the Board's revocation order. (Code Civ. Proc., § 1094.5.) The trial court denied the writ petition.

Aquino raises four issues on appeal. First, Aquino contends the wrong standard of care has been applied in the case. Second, Aquino asserts there is not substantial evidence that she caused harm to the patient involved in the case. Third, Aquino contends the Board lacks jurisdiction to discipline her for a medical privacy violation. Fourth, Aquino asserts the Board failed to follow the proper procedures when revoking her license. We reverse with directions.

## FACTUAL AND PROCEDURAL HISTORY

### A. CARE OF PATIENT

#### 1. DOCTOR'S ORDERS

Patient was 72 years old and was a patient in the telemetry unit of Pomona Valley Hospital Medical Center (the Hospital). Telemetry is a step below intensive care. Every telemetry patient wears a heart monitor, so their heart status is monitored at all times; their other vital signs are taken every four hours. Patient was admitted to the Hospital due to suffering acute gastrointestinal bleeding. Patient's cardiologist

2

concluded Patient was not stable, from a cardiac perspective, to have an endoscopy. The doctors planned to monitor Patient and conduct an endoscopy if Patient's cardiac issues were to resolve. Additional issues facing Patient included coronary artery disease; end-stage renal disease; hypertension; and atrial fibrillation.

On July 29, 2016, a doctor entered an order for Patient to receive a nitroglycerin tablet sublingually every five minutes, a maximum of three times, as needed for chest pain. If Patient continued to have chest pain after three doses of nitroglycerin, then a physician was to be notified. On August 1, 2016, a doctor entered an order for Patient to receive one inch of nitroglycerin ointment every six hours, as long as Patient's systolic blood pressure was greater than 100 mmHg.

### 2. *HOSPITAL PROTOCOL*

The Hospital has a standardized procedure order for nurses when a patient is suffering chest pain: (1) start or increase supplemental oxygen to maintain a minimum 93 percent oxygen saturation; (2) obtain a STAT 12-lead electrocardiogram (EKG) within 5 minutes of the onset of pain, and contact a cardiologist with the EKG results; (3) if the patient's systolic blood pressure is greater than 90 mmHg, then administer nitroglycerin sublingually, and repeat the administration two more times at intervals of three to five minutes for sustained chest pain; and (4) monitor blood pressure and heart rate every five minutes until the chest pain is gone, and then two more times at 30-minute intervals (the Hospital Protocol). (See Cal. Code Regs., tit. 16, § 1474 [standardized procedure guidelines].)

A registered nurse certified in advanced cardiovascular life support (ACLS) could order the Hospital Protocol without a doctor's approval, in order "to expedite care." Every nurse on the telemetry floor was ACLS certified. One of the contraindications for implementing the Hospital Protocol is if "[t]he patient's physician has written specific orders for any of the conditions listed [e.g., chest pain] and then those orders would be followed."

### 3.  *CARDIAC ARREST*

Aquino received her registered nurse license in 1988 and had worked at the Hospital since approximately 2006. On the morning of August 2, 2016, Patient "was in atrial fibrillation and receiving oxygen with a nasal cannula."

During the overnight shift from August 2 to 3, 2016, Aquino was assigned to Patient. On August 2, 2016, between 8:30 p.m. and 11:00 p.m., Patient complained of chest pain four times. Aquino administered sublingual nitroglycerin tablets to Patient the first two times Patient complained of chest pain. The third time, Aquino gave Patient the nitroglycerin ointment due to Patient having low blood pressure; his blood pressure was 97/70. When Patient complained the fourth time, the charge nurse administered nitroglycerin sublingually. Around 4:00 a.m., Patient suffered cardiac arrest. Patient was transferred to the intensive care unit. Patient died on the afternoon of August 3, 2016.

4.    *DISCHARGE SUMMARY*

The Hospital's discharge summary reflects Patient was suffering from "acute blood loss anemia and [gastrointestinal] bleeding, was given [a packed red blood cell] transfusion, was unstable for any [endoscopy] or colonoscopy due to acute myocardial inf[ar]ction. . . . During the hospital stay, he also was being managed for acute kidney injury with underlying [chronic kidney disease] . . . . The patient during the hospital stay went into cardiac arrest, ventricular fibrillation, was intubated, placed on [a] mechanical ventilator and transferred to the ICU. . . . Family decided that the patient be DNR/DNI and decided on withdrawal of care. The patient was subsequently extubated and pronounced dead at 14:40 on 08/03/2016."

B.    ADMINISTRATIVE PROCEEDINGS

In an administrative complaint, the Board alleged Aquino was grossly negligent in her care of Patient because she failed to follow the Hospital Protocol. Aquino contended she was following the doctors' orders, and because doctors' orders were in place the Hospital Protocol was contraindicated.

Paulette Wozencroft is the Nurse Manager of the Hospital's telemetry unit, and she is a registered nurse who has worked as a nurse in a telemetry unit. Wozencroft was Aquino's manager. The following exchange occurred during the cross-examination of Wozencroft:

Aquino: "[D]o we have to follow [the Hospital Protocol] even though the patient is already admitted with a doctor's order for chest pain?

"[Wozencroft]: Yes."

5

Wozencroft went on to explain, "[I]f a physician wrote 'Sublingual nitro,' you know, 'every three minutes, PRN, food stop,' it doesn't have all of these elements in the order. You have a medication order. [¶] Here, the elements of this order goes a little beyond. This does not get rid of the physician's order. That physician order still stands. What we are doing now is doing the 12-lead EKG, we're doing the oxygen, we're supposed to be calling the physician, all of those things added into this."

In a proposed decision, the ALJ found that Aquino failed to follow the Hospital Protocol. Specifically, Aquino did not (1) chart Patient's oxygen saturation when he complained of chest pain; (2) perform a 12-lead EKG; (3) administer the nitroglycerin sublingually despite Patient's blood pressure being greater than 90 mmHg; and (4) monitor Patient's blood pressure and heart rate every five minutes until the pain passed, and twice at 30-minute intervals thereafter. The ALJ concluded Aquino acted with gross negligence in her care of Patient on August 2 and 3, 2016. (§ 2761, subd. (a)(2).)

The ALJ found no factors in mitigation. In aggravation, the ALJ found that Aquino was uncooperative with the Board's investigation, and cooperation is required from all licensees. Given Aquino's lack of cooperation, the ALJ concluded Aquino would not comply with probation, so "the public can only be protected with an order revoking [Aquino's] license." The ALJ proposed that Aquino's registered nursing license be revoked, and the Board adopted the proposed decision and order.

6

## C.   TRIAL COURT PROCEEDINGS

Aquino petitioned the trial court for a writ of administrative mandate (Code Civ. Proc., § 1094.5) directing the Board to set aside its adoption of the ALJ's proposed decision.  Aquino contended the ALJ applied the wrong standard of care.  Aquino asserted the Hospital Protocol did not apply to Patient, who had doctors' orders pertaining to chest pain.  Aquino contended the standard of care was the doctors' orders.

In response, the Board asserted Aquino failed to identify the doctors' orders that were in place prior to her shift on August 2, 2016.  In Aquino's reply, she gave a citation to the exhibit that contained the doctors' orders and argued that she had to follow the doctors' orders.

During a hearing on the writ petition, Aquino contended that the Hospital Protocol does not apply to a patient who has a doctor's order in place for chest pain. She gave the example that an EKG, required by the Hospital Protocol, was not needed for Patient because he was in a telemetry unit, which requires around-the-clock heart monitoring.  Aquino argued, "[T]hat's not the standard of care for the patient for that night, for that particular patient.  [¶] . . . [T]he patient already ha[d] a specific order for the nitroglycerine, so we don't follow [the Hospital Protocol]."

In the trial court's ruling, it concluded the ALJ/Board's findings were supported by the administrative record.  The trial court wrote, "Competent expert testimony showed that Aquino's conduct violated the standard of care for a registered nurse. [Citations.]  Evidence was presented regarding the [Hospital] Protocol, and that Aquino

7

did not follow it [citation] and believed she did not need to follow it." The trial court denied Aquino's writ petition.

## DISCUSSION

### A.    STANDARD OF CARE

Aquino contends the wrong standard of care has been applied in the case because the standard of care is the doctors' orders, not the Hospital Protocol.

A writ of administrative mandate examines "whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if . . . the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).)

"When an administrative decision substantially affects a fundamental vested right, such as the revocation of a professional license or the right to practice one's profession, the independent judgment standard of review applies. [Citations.] The superior court examines the administrative record for errors of law and exercises its independent judgment upon the evidence 'in a limited trial de novo.' [Citations.] The superior court resolves evidentiary conflicts, assesses the witnesses' credibility, and arrives at its own independent findings of fact. [Citation.]

"On appeal, we do not exercise our independent judgment. We review the trial court's findings under the substantial evidence test and determine whether substantial evidence supports the trial court's conclusions. [Citations.] We must resolve all conflicts in the evidence, and indulge all reasonable inferences, in favor of the superior

8

court's judgment." (*Rand v. Board of Psychology* (2012) 206 Cal.App.4th 565, 574-575.)

In the context of nursing, the standard of care is the level of care "which, under similar circumstances, would have ordinarily been exercised by a competent registered nurse," in a similar locality. (Cal. Code Regs., tit. 16, § 1442; see also *Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 215.) A hospital's policy or protocol regarding the medical procedures to be implemented in a particular situation is admissible evidence on the issue of the standard of care but does not necessarily set the standard. (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1003 [conc. opn. of J. Mosk]; *Dillenbeck v. City of Los Angeles* (1968) 69 Cal.2d 472, 480-481.) In other words, rules or protocols "have a direct bearing on the question of negligence even though they do not of themselves establish the standard of prudent conduct." (*Tucker v. Lombardo* (1956) 47 Cal.2d 457, 464.)

It is the trier of fact's role to decide "what the unformulated standard is of reasonable conduct" given the facts of the case. (*Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 547.) Thus, while the standard of care remains constant, i.e., a reasonably competent nurse, "the amount of care deemed reasonable in any particular case will vary." (*Flowers v. Torrance Memorial Hospital Medical Center*, *supra*, 8 Cal.4th at p. 997.)

The conflict regarding the standard of care arises from the wording of the Hospital Protocol, which reads, "Patient contraindications: [¶] . . . [¶] . . . The patient's physician has written specific orders for any of the conditions listed and then those

9

orders would be followed." Chest pain is one of the conditions to which the Hospital Protocol applies.

Aquino reads the Hospital Protocol as indicating that the doctors' orders for nitroglycerin for Patient's chest pain superseded any implementation of the Hospital Protocol. In other words, it is an all-or-nothing viewpoint—the medication order regarding chest pain meant that none of the Hospital Protocol should have been implemented. Aquino's position is that the doctors' medication orders—not the Hospital Protocol—set the standard of care.

In conflict with Aquino's explanation of the Hospital Protocol is Wozencroft's explanation. Wozencroft testified that if a doctor's order for medication is in place, then that medication order would supersede the medication portion of the Hospital Protocol, but the remainder of the Hospital Protocol should apply, e.g., a 12-lead EKG and oxygen. Wozencroft's understanding of the Hospital Protocol is that it is *not* an all-or-nothing protocol.

As an appellate court, our role is limited. We must resolve all evidentiary conflicts in favor of the trial court's conclusions. (*Rand v. Board of Psychology*, *supra*, 206 Cal.App.4th at pp. 575-574.) The trial court accepted Wozencroft's explanation of the Hospital Protocol as setting forth the standard of care. We cannot resolve that conflict in a different manner—we must resolve the conflict in favor of the trial court's conclusion: Wozencroft's testimony that the Hospital Protocol applied to Patient, with the exception of the medication portion of the Hospital Protocol, is substantial evidence for using the Hospital Protocol as the standard of care.

10

### B.    CARE PROVIDED BY AQUINO

Aquino contends there is not substantial evidence that she could have jeopardized Patient's health or life.  Causation, as it is typically understood in tort law, is not an element in this professional negligence case.  The definition of professional gross negligence is:  "[A]n extreme departure from the standard of care which, under similar circumstances, would have ordinarily been exercised by a competent registered nurse.  Such an extreme departure means [either (a)] the repeated failure to provide nursing care as required or [(b) the] failure to provide care or to exercise ordinary precaution in a single situation which the nurse knew, or should have known, could have jeopardized the client's health or life."  (Cal. Code Regs., tit. 16, § 1442.)

A "repeated failure" refers to a " ' "[h]abitual disregard" ' " of one's duties. (*Farnham v. State Bar* (1988) 47 Cal.3d 429, 445-446.)  A "repeated failure" case does not involve "a series of aberrant or uncharacteristic acts, but rather ' "a continuing course of serious professional misconduct extending over" ' " a considerable period of time.  (*Id.* at p. 447.)  The instant case involves one patient during a single shift, which means it is "a single situation."  Accordingly, we examine whether there is substantial evidence that Aquino's failure to precisely follow the Hospital Protocol "could have jeopardized [Patient's] health or life."  (Cal. Code Regs., tit. 16, § 1442.)

"The standard of proof to be applied at a superior court writ proceeding inquiring into the validity of a final administrative order is the *weight of the evidence* standard. [Citation.]  This standard is considered to be synonymous with the *preponderance of the evidence* standard."  (*Ettinger v. Board of Medical Quality Assurance* (1982) 135

11

Cal.App.3d 853, 858.) When a case involves a complex medical injury, then expert testimony must be presented to explain the harm caused. "That opinion must be expressed 'to a reasonable medical probability,' which . . . means more likely than not [citation], because more likely than not is the threshold level of certainty necessary" for the preponderance of the evidence standard. (*Kline v. Zimmer, Inc.* (2022) 79 Cal.App.5th 123, 131 (*Kline*).) Thus, we examine whether there is evidence, to a reasonable medical probability, that Aquino's breach could have harmed Patient's health or life.

The Hospital Protocol requires a nurse to keep a patient's oxygen saturation above 93 percent. On August 2, 2016, at 11:30 p.m., Patient's oxygen saturation was 95 percent. On August 3, 2016, at 3:25 a.m., Patient's oxygen saturation was 92 percent. Wozencroft explained, "When a patient is having chest pain, time is of the essence because your heart is being starved of what it needs," i.e. oxygen. However, Wozencroft did not explain if Aquino's failure to provide supplemental oxygen could have endangered Patient. A cardiologist or pulmonologist did not testify regarding the danger, if any, posed by a 92-percent oxygen saturation level.

The Hospital Protocol requires a nurse to "[o]btain a-STAT 12-lead EKG within 5 minutes of the onset of pain." An EKG was performed on Patient at 11:35 a.m. on August 2, 2016. The EKG report reads: "Atrial fibrillation [¶] Left ventricular hypertrophy with QRS widening [¶] Marked T wave abnormality, consider anterolateral ischemia [¶] Abnormal ECG."

Wozencroft explained that the 12-lead EKG could have revealed if Patient's condition were worsening and permitted a cardiologist to assess the situation. However, she did not explain the difference between a 12-lead EKG and the telemetry floor's heart monitor. There is also no explanation as to why Patient could have been in danger due to being observed by the telemetry floor's heart monitor, rather than a 12-lead EKG. Given that a variety of heart problems had already been identified by an EKG approximately 12 hours earlier, it is unclear how using the telemetry floor's heart monitor, rather than an EKG, created danger. Of course, it is possible that it did create a danger; the point is that there is no evidence explaining how Aquino's use of a heart monitor, rather than an EKG, could have endangered Patient.

The Hospital Protocol requires a nurse to contact a cardiologist with the results of the EKG. There is no evidence indicating what a cardiologist would have done, if anything, had Aquino contacted a cardiologist with the information regarding Patient's chest pains and vital signs. Accordingly, there is no evidence that the failure to contact a cardiologist could have jeopardized Patient's health or life.

The Hospital Protocol requires a nurse to administer nitroglycerin sublingually, every three to five minutes for sustained chest pain. There were doctors' orders in place regarding the administration of nitroglycerin. Accordingly, per Wozencroft's explanation of the Hospital Protocol, this portion of Hospital Protocol would not apply; rather, the doctors' orders would apply.

13

One doctor ordered one inch of nitroglycerin ointment every six hours if Patient's systolic blood pressure was greater than 99 mmHg. Another doctor ordered sublingual nitroglycerin tablets, every five minutes, as needed for chest pain. Patient complained of chest pains four times during the relevant time period. Three times he received sublingual nitroglycerin and one time he received nitroglycerin ointment. There is no evidence explaining how the administration of nitroglycerin may have jeopardized Patient's health or life. For example, there is no testimony from a cardiologist indicating what might have occurred had nitroglycerin been administered to Patient at more frequent intervals.

The Hospital Protocol requires a patient's blood pressure and heart rate to be checked every five minutes until they are pain free. On the night of August 2 to 3, 2016, Patient's blood pressure was taken at 7:39 p.m., 8:00 p.m., 11:39 p.m., midnight, and 3:25 a.m. There is no evidence indicating how the failure to take Patient's blood pressure every five minutes while he experienced pain may have jeopardized Patient's health or life.

The Board's expert witness was Patricia E. Karnstedt. Karnstedt is the Nursing Director for a hospice company and she worked in a hospital for seven years. Patients on hospice are not on heart monitors, so no telemetry is involved in Karnstedt's hospice work. Karnstedt testified that protocols, such as the Hospital Protocol, "if they're followed, they give the opportunity for the best outcome, and it's based on scientific evidence. It's not something anybody makes up."

Karnstedt continued, "I feel had she activated [the rapid response team], called the cardiologist, followed the protocol, we don't have a crystal ball, but [we] very well could have had a different outcome, but we don't know that now."  Karnstedt repeated herself saying, "[The Hospital Protocol] is there for a reason . . . maybe we would have changed the outcome."  Karnstedt's opinion that "maybe" Aquino placed Patient in jeopardy does not meet the standard of a reasonable medical probability, i.e., more likely than not.  (*Kline*, *supra*, 79 Cal.App.5th at p. 131.)

When asked about Patient's various diagnoses, Karnstedt said she knew Patient had "AFib and hypertension" and "some intestinal problems," but she was unaware of any other medical issues, e.g., end-stage renal failure and acute internal bleeding.  Karnstedt did not look at the vital signs the certified nursing assistant recorded for Patient on the night of August 2 to 3, 2016.  Karnstedt did not review Patient's chart for the time he was in intensive care.  Karnstedt concluded that Aquino's breach of the standard of care constituted gross negligence.

Karnstedt's testimony lacks substance in that she failed to explain how Aquino's breach could have endangered Patient.  For example, Karnstedt asserted that if Aquino had contacted a cardiologist then a different result could have occurred, but there is no testimony from a cardiologist supporting that theory.  In order to demonstrate that Aquino's breach could have jeopardized Patient's health, the Board needed evidence, ideally from a cardiologist, explaining how Aquino's failure to precisely follow the Hospital Protocol placed Patient in danger.

In a report by the Board's investigator, there is nothing reflecting a cardiologist was interviewed as part of the Board's investigation. In a separate report by Karnstedt, she wrote that her report was based upon the "investigating information." In Karnstedt's report, she concluded Aquino failed to follow the Hospital Protocol, which "potentially contributed to a disastrous outcome for her patient." Karnstedt's opinion that Aquino "potentially contributed" to the harm suffered does not explain in what respect Aquino's breach could have jeopardized Patient's life or health, to a reasonable medical probability. (*Kline*, *supra*, 79 Cal.App.5th at p. 131.)

In closing argument before the ALJ, the Board's attorney relied on Karnstedt's opinion, asserting that if Aquino had contacted the rapid response team, "[t]hat might have made a major difference." The attorney repeated himself arguing, "[If] she followed the proper protocols, there may have been a different outcome." The attorney's closing argument fails to identify, with evidence, how Aquino's breach could have jeopardized Patient's health or life. The Board has relied on speculation that Aquino's breach could have harmed Patient.

On appeal, the Board argues that the evidence demonstrates Aquino failed to follow the Hospital Protocol/standard of care. The Board's argument is insufficient. The Board needed to present evidence explaining how Aquino's breach could have endangered Patient. (Cal. Code Regs., tit. 16, § 1442.) Such evidence could include testimony from a cardiologist explaining how the failure to precisely follow the Hospital Protocol put Patient's health or life at risk. Without that evidence, there is no means by which one can conclude Aquino's breach could have endangered Patient.

In the trial court's analysis, it wrote, "Aquino argues that the Accusation failed to plead the elements for the tort of gross negligence. However, the Accusation alleged 'gross negligence' as it is defined under Business & Professions Code section 2761 and CCR, Title 16, section 1442. [Citation.] Specifically, the [Board] alleged Aquino failed to follow the [Hospital] protocol . . . for Patient . . . , which was an extreme departure from the standard of care that would have been ordinarily exercised by a competent registered nurse. [Citation.] Aquino's other arguments regarding lack of causation and injury are therefore not demonstrated."

The trial court's analysis fails to specifically address the requirement that, if the allegation of gross negligence is based upon a single incident, then there must be evidence that the incident "could have jeopardized the client's health or life." (Cal. Code Regs., tit. 16, § 1442.) In reading the trial court's analysis, it appears the trial court concluded that Aquino breached the standard of care and therefore was grossly negligent.

Although we do not review the ALJ's/Board's decision, for the sake of thoroughness we look at it to see if the ALJ/Board made a finding regarding endangering Patient's life. The ALJ quoted the proper regulation, including the element that the breach could have jeopardized a patient's health or life. (Cal. Code Regs., tit. 16, § 1442.) The ALJ gave a detailed summary of the evidence along with his factual findings. However, the ALJ did not describe any evidence explaining how Aquino's breach could have endangered Patient.

17

Given the lack of evidence in the record pertaining to how Aquino's breach could have jeopardized Patient's health or life, we conclude the trial court abused its discretion.

C.     PRIVACY VIOLATIONS

Aquino contends the Board does not have authority to discipline her for allegedly violating Patient's medical privacy rights because the State Department of Public Health (DPH) (Health & Saf. Code, § 20) has exclusive jurisdiction to decide if violations occurred, and the DPH concluded a violation did not occur.

The Board's charges against Aquino included a violation of the Confidentiality of Medical Information Act (CMIA).  (Civ. Code, § 56.)  The CMIA statute provides: "A licensed health care professional who knowingly and willfully obtains, discloses, or uses medical information in violation of this part shall be liable on a first violation for an administrative fine or civil penalty not to exceed two thousand five hundred dollars ($2,500)."  (Civ. Code, § 56.36, subd. (c)(2)(B).)  However, the "[i]mposition of a fine or penalty . . . shall not preclude imposition of other sanctions or remedies authorized by law."  (Civ. Code, § 56.36, subd. (f)(2)(5).)

Aquino's argument relies on Health and Safety Code section 1280.15.  That statute provides:  "A clinic, health facility, home health agency, or hospice . . . shall prevent unlawful or unauthorized access to, and use or disclosure of, patients' medical information, as defined in [CMIA]."  (Health & Saf. Code, § 1280.15, subd. (a).)  The statute authorizes DPH, after an investigation, to "assess an administrative penalty for a violation of this section of up to twenty-five thousand dollars ($25,000) per patient

18

whose medical information was unlawfully or without authorization accessed, used, or disclosed." (Health & Saf. Code, § 1280.15, subd. (a).)

Aquino's argument that the DPH has exclusive jurisdiction to decide violations of CMIA is not persuasive because she is relying on a statute that applies to healthcare facilities. Health and Safety Code section 1280.15, subdivision (a), does not apply to *people* licensed in various healthcare professions.

### D.    BOARD PROCEDURES

Aquino contends the Board failed to follow the proper procedures when adopting the ALJ's decision. For example, she asserts a quorum of the Board did not meet as required. Due to our conclusion *ante*, we will reverse the trial court's judgment and direct the trial court to command the Board to vacate its adoption of the ALJ's proposed decision. Accordingly, this issue is moot.

### E.    FORFEITED CONTENTIONS

Aquino raises a variety of issues that are unsupported by reasoned analysis and/or legal citations. For example, Aquino sets forth a list of procedural events from the administrative proceedings that she concludes were unfair. Due to Aquino's failure to support the remaining arguments with reasoned legal analysis and/or legal citations, we deem the issues to have been forfeited. (*Central Valley Gas Storage, LLC v. Southam* (2017) 11 Cal.App.5th 686, 694-695.)

19

# DISPOSITION

The judgment is reversed. The trial court is directed to issue a writ directing the Board to (1) vacate its order adopting the ALJ's decision (Gov. Code, § 11517, subd. (c)(2)(A))**2**; (2) enter a new order rejecting the ALJ's decision because the gross negligence finding is not supported by the evidence (Gov. Code, § 11517, subd. (c)(2)(D)&(E)); and (3) either refer the case back to the ALJ or decide the case based upon the record (Gov. Code, § 11517, subd. (c)(2)(D)&(E)). Aquino is awarded her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

RAPHAEL
J.

---

**2** "[T]he administrative adjudicative provisions of the Administrative Procedure Act (Government Code Section 11400 et seq.)" apply to the Board's disciplinary actions. (Cal. Code Regs., tit. 16, § 1444.5.)

20